**H. A. REGAL, Plaintiff in Error,**

**v.**

**H. E. RIEGEL and Home Federal Savings & Loan Association of Tulsa, Defendants in Error.**

**No. 42002.**

Supreme Court of Oklahoma.

Sept. 23, 1969.

Rehearing Denied Jan. 27, 1970.

Spillers & Spillers, by G. C. Spillers, Jr., Tulsa, for plaintiff in error.

Murdock, Schwabe & Monnet, by Edward O. Monnet, Tulsa, for defendant in error, H. E. Riegel.

LAVENDER, Justice.

This action originated in the district court as an action to establish and enforce a constructive trust in real property and for an accounting. A trial resulted in a judgment in favor of defendants and against the plaintiff. Plaintiff's motion for new trial was overruled and the plaintiff has appealed.

The appeal concerns primarily that part of the judgment in favor of the principal defendant in the trial court, H. E. Riegel. The plaintiff in error, H. A. Regal, who was the plaintiff in the trial court, is the son of the defendant in error, but in 1936 had changed the spelling of his surname. Home Federal Savings and Loan Association of Tulsa, Oklahoma, was a party de-

fendant in the trial court, as a stakeholder, but is not named as a defendant in error in this court. Unless otherwise indicated, the term "defendant," as used herein, will refer to the individual defendant, H. E. Riegel.

The plaintiff commenced his action on January 18, 1965, alleging that, in November of 1945, he was engaged in the construction business in North Dakota, and the defendant was the owner of a described portion of Lot 3 of Section 3 of Township 19 North, Range 13 East of the Indian Meridian, in Tulsa County, Oklahoma; that, in November of 1945, the defendant requested him to come to Tulsa, Oklahoma, and assist him in the construction of an industrial building on the described land, upon the oral agreement and understanding that, if the plaintiff would design, and supervise the construction of, the building, "he would be the owner of an undivided one-half interest in the real estate, together with the improvements thereon;" that, pursuant to such agreement, he came to Tulsa and designed, and supervised the construction of, such building; that, in 1950, "operating under the same agreement and understanding," the parties constructed a second building on the real estate, and, about the year 1957, operating "under the same agreement and understanding," a third building was constructed on the real estate; that it was further agreed, in connection with such "joint adventure," that the plaintiff would receive one-half of the profits therefrom, but he has received none of the profits; that an action by the State of Oklahoma to condemn a portion of the described tract of land was concluded in November of 1964, by the payment of the sum of $162,000.00 to the defendant, who deposited $150,000.00 thereof with Home Savings and Loan Association of Tulsa (which, in its answer, admitted that, on November 20, 1964, the defendant had opened a single-name savings share account, and stated that it would hold the account subject to the orders of the trial court); that the plaintiff was entitled to one-half of the condemna-

tion money and $81,000.00 of said $150,-000.00 is the property of the plaintiff; that, throughout the years, the defendant had periodically acknowledged the existence of the joint adventure and reaffirmed the same, and did not repudiate or deny it until January 16, 1965. The plaintiff prayed for judgment establishing the existence of the joint adventure between the plaintiff and the defendant, decreeing the plaintiff to be the owner of an undivided one-half interest in and to the described real estate less the portion taken in condemnation by the State of Oklahoma, and the owner of $81,000.00 of the account with the Home Savings and Loan Association of Tulsa, then standing in the name of the defendant Riegel, and requiring the defendant to account to the plaintiff for all rents and profits received by the defendant from the premises during the existence of the joint adventure, and that the plaintiff have judgment against the defendant for one-half of the net value thereof.

In his answer, the defendant admitted ownership of the real property in question and of an account with Home Federal Savings and Loan Association, and, in addition to a general denial, specifically denied the agreement pleaded by the plaintiff and, in the alternative, pleaded the statute of frauds and the statute of limitations.

In his reply, the plaintiff denied that his action was barred by the statute of limitations or that the statute of frauds was applicable and alleged that, if the statute of frauds would be applicable, the agreement in question was taken out of the operation of that statute by virtue of his full performance of his part of the agreement.

The cause was tried to the court and, at the conclusion of the plaintiff's evidence, the defendant demurred thereto on the grounds that the evidence does not show or state a cause of action, and that it clearly shows that the agreement alleged by the plaintiff violates the statute of frauds and that his action was barred by the statute of limitations. The trial court reserved ruling on that demurrer, with the understanding that the defendant would not be preju-

diced by putting on his evidence without a ruling on the demurrer.

At the conclusion of the trial, the trial court filed written findings of fact and conclusions of law, which, by reference, were made a part of the court's journal entry of judgment. Based upon its findings of fact, the trial court's conclusions of law were as follows:

"1. That the demurrer of the defendant to the plaintiff's evidence should have been and is hereby sustained.

"2. That the alleged contract was in direct violation of the Statute of Frauds and the Statute of Limitations of the State of Oklahoma.

"3. That *from all of the evidence,* the Court should and hereby does grant a judgment in favor of the defendants and against the plaintiff herein, all as per journal entry." (Emphasis supplied)

The pertinent portion of the journal entry reads as follows:

"It is, therefore, the order, judgment and decree of the Court that the demurrer to plaintiff's evidence be and the same is hereby sustained and that, *based upon all the evidence,* judgment is hereby entered in favor of the defendants and against the plaintiff and at the cost of the plaintiff, to which the plaintiff objected, and exception was allowed." (Emphasis supplied)

The plaintiff presents all of his allegations of error in the judgment of the trial court under five propositions. In his first four propositions, the plaintiff attacks, respectively, the four findings of fact made by the trial court. In his fifth proposition, he argues that the original agreement between the plaintiff and defendant made them tenants in common with the plaintiff *owning an undivided one-half interest in* and to the real property described in his petition, which the defendant held in trust for him as a constructive trustee thereof, and that:

"1. The trial court's finding that the original agreement was too indefinite and uncertain to be enforced is erro-

neous because the contract had been fully performed by the plaintiff. It is also contrary to Title 16, Section 11, O.S. 1965, which provides upon accepting the benefits of a contract relating to real estate, the defendant 'is estopped to deny the validity of such * * * contract.'

"2. The trial court's finding that the plaintiff's action is barred by the statute of frauds is also clearly erroneous because: First, it does not apply to a constructive trust, and Second, the plaintiff fully performed.

"3. The trial court's finding that the plaintiff's action was barred by the statute of limitations is also clearly erroneous because: First, the parties were tenants in common and the possession of the premises by the defendant was constructive possession for his co-tenant, the plaintiff; Second, the defendant did not oust or attempt to deny the plaintiff's claim until immediately before the commencement of this action; Third, the defendant did not have exclusive possession of the premises for the fifteen year period of the statute of limitations because the undisputed evidence discloses that at all times the plaintiff stored equipment and material upon the premises and occupied an office thereon; and Fourth, the defendant acknowledged from time to time the plaintiff's interest in the premises which would have had the effect of breaking a chain of adverse possession had the defendant asserted such, which he did not."

The three statements just quoted not only indicate the ultimate findings of fact set forth in the trial court's four findings of fact but also summarize the plaintiff's argument under his first four propositions.

Since the trial court heard all of the evidence before sustaining the defendant's demurrer to the plaintiff's evidence and rendering judgment for the defendants based upon all of the evidence, we shall consider the case as though the trial court had overruled the defendant's demurrer at the close of the plaintiff's case in chief.

The plaintiff's claim to one-half of the condemnation money received by the defendant for a portion of the real property described in the petition, and his claim to an accounting and for judgment for one-half of the net rents and profits from the entire tract, are bottomed upon his claim of equitable ownership, as the beneficiary of a constructive trust arising out of (but not expressly provided for in) alleged oral agreements with the defendant, of an undivided one-half interest in and to such real property. Those claims to incidental relief must, of course, stand or fall with his claim to being the beneficiary of a constructive trust in real property, arising out of certain oral agreements with the defendant.

In an action of equitable cognizance, this court will examine the whole record and weigh the evidence and affirm the judgment of the trial court unless clearly against the weight of the evidence or contrary to law or established principles of equity; and, where a certain fact is required to be established by proof of a certain degree or character, the two rules must be taken and considered together, and, in such cases, this court will, in weighing the evidence, determine whether or not the proof conforms to the required standard. Nisbet v. Midwest Oil Corporation (Okl.1968), 451 P.2d 687.

This court has consistently held that the existence of a constructive trust may be established by parol evidence, but, for the safety of titles, the law requires that the proof be of the most satisfactory kind; and that the onus of establishing the existence of a constructive trust rests upon him who seeks its enforcement, and, before a court of equity will be warranted in making a decree therefor, the evidence must be clear, unequivocal, and decisive. See: Teuscher et al. v. Gragg (1929), 136 Okl. 129, 276 P. 753, 66 A.L.R. 143; Poe et al. v. Poe (1952), 208 Okl. 406, 256 P.2d 153; Peyton et al. v. McCaslin et al. (Okl.1966) 417 P.2d 316; Goodwin et ux. v. Beard (Okl.1967), 434 P.2d 192. And, in Barry v. Frizzell et al. (Okl.1962), 371 P.2d 460,

it is held that the existence of a constructive trust must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to lead to but one conclusion, or as to leave no reasonable doubt as to the existence of the trust.

The factual background, as related by the plaintiff and his two sisters (who testified upon his behalf), is that, in 1940, their father, who is the defendant herein, was on relief working for the W.P.A. and the parents' home in a town near St. Paul, Minnesota, was about to be sold under foreclosure but was sold for enough that they bought a car and came to Tulsa, Oklahoma, arriving in December of 1940 with very little money left; that the defendant went into business in a small plant in West Tulsa, manufacturing and selling concrete burial vaults, with all of the manufacturing process, including the mixing of the concrete, being done by hand by the witnesses' mother and the defendant; that some time during 1941, at the request of the parents, the two daughters quit good jobs in Chicago and came to Tulsa to help their parents around the home and with the business which, at that time, was not very good; that, for some time, the daughters received no compensation other than their board and room, living with their parents, although, in 1958 and 1959, after both had moved from their parents' home, their "take home" pay from their father was slightly in excess of $130.00 per month; that, in the wintertime of 1941, the plaintiff, who was working for a large construction firm in Minnesota, stopped in Tulsa on his way to Florida, for a vacation, but, instead of going on to Florida, used up all the money that he had with him (the plaintiff said about $1200.00) in paying delinquent rent on the burial vault plant and the parents' home, living expenses for the five members of the family, including the plaintiff who was not married at the time, and in purchasing a truck, concrete mixers, and other mechanical equipment for the burial vault business, and ended up taking a job in construction work at Tinker Field near Oklahoma City;

that, for a while after the defendant started the burial vault business, his business was so poor that he took a job at Choteau, Oklahoma, for a year or so, leaving the business in the hands of his wife and two daughters, but, when it became impossible to buy steel burial vaults because of the war, the business (which was known as the Cemstone Company) began to prosper and became very good, and the defendant decided that a larger plant was needed; and that, knowing that the plaintiff could locate the necessary materials at a low price and would do a good job, economically, the defendant, with the agreement of his wife and two daughters, wrote to the plaintiff, at Devils Lake, North Dakota, where he was working on a large construction job for the Minnesota construction firm, telling him that, if he would come to Tulsa, and construct a building on a tract of land near Tulsa that the defendant had purchased earlier in 1941, designing it and taking full charge of construction, the defendant would give him a half interest in the property.

The plaintiff testified that, at that time, his salary was slightly in excess of $180.00 per week, but, after receiving several such letters from the defendant, he quit his job and came to Tulsa with his wife, arriving with about $15,000.00 in cash and savings bonds, shortly before Thanksgiving of 1945. He was asked whether or not, after arriving in Tulsa, he had any discussion with the defendant concerning the matters mentioned in those letters, and answered:

"Yes. Mother—Mother and Dad and my two sisters, we had a meeting that night. We all met around the home. My dad advised me that he needed me, and he said that if I would take charge of construction, that he'd saved pretty near 30,000, we'd have 30,000 by the time the building was completed. If I'd design the building, according to this 30,000, take full charge of construction, buy all the material, he'd pay for it, he'd give me half interest in the land and the building, and assist him—and if I'd assist

him in his operation, because he needed help."

The plaintiff testified that he agreed to do so, and also testified that it was part of that original agreement that he would design and construct a two-story section at the front of the plant section, with a showroom and two offices (one for the defendant and one for the plaintiff so long as he wanted to use it) on the ground floor and two apartments (one for the defendant and his wife and two daughters and one for the plaintiff and his family so long as he wanted to live there) upstairs; and that the building was designed and constructed that way, on the southwest corner of the tract in question, with the plaintiff hauling in shale for fill and leveling off the site, locating and arranging for the purchase of all of the materials used in the building, laying out the building, constructing all of the scaffolding, doing all of the electrical work (since the city's electrical code did not apply to this tract of land), setting all the window frames, hanging all of the doors, finishing all of the concrete, and doing any other physical labor that needed to be done, in addition to designing the building, teaching the laborers (all of whom were inexperiened in construction work) how to do their work, and supervising the entire job.

The plaintiff also testified that, in addition to purchasing the needed tools and equipment for the job with his own money, he advanced to, or for, the defendant, some eight to ten thousand dollars for materials and labor for the job; that it took about nine months to complete that building, and he helped move the vault-making equipment into the building. He testified, on cross-examination, that, under the original agreement, his one-half interest in the property in question was to start when he started work on the plans for that building.

Except that they did not mention anything being said about the plaintiff assisting the defendant in his operation, the testimony of the plaintiff's sisters concerning the conversation in the parents' home the night that the plaintiff arrived in Tulsa in 1945, and concerning when the plaintiff's interest in the property was to start, was essentially the same as the plaintiff's testimony concerning those matters. Both testified that the plaintiff designed the building, located materials for the building, and, besides supervising construction, did much of the physical labor involved in its construction.

The plaintiff testified that, after completing this first building, he went into the construction business for himself, in Tusla, under the name of Regal Construction Company, and acquired quite a bit of construction equipment for his work; that, early in 1947, he contracted a $187,000.00 school building job in North Dakota and shipped his construction equipment there; that, after working in North Dakota during 1947 and 1948, he returned to Tulsa, shipping all of his equipment there; that, after he returned to Tulsa from North Dakota, the defendant came to him and said, "Now, Sargents wants a building built. We can get a nice—we can get some nice rental out of it. I'll give you half of the rent. It will be the same agreement as the first. You design it;" that he designed the second building, and, in addition to hauling in more shale and leveling it with his own bulldozer, supervising the entire job and doing a lot of the physical labor himself, as on the first building, he furnished all of the construction equipment that was used on the job, and fuel for it, and most of the materials (which he had left over from construction and demolition contracts with others) that were used in the building, except the concrete blocks, and received no money for any of it; and that it took from six to nine months to complete the second building.

Concerning the concrete blocks used in the second building, the plaintiff testified that, not long after the first building had been completed, the defendant learned of a concrete block plant in Missouri that was going out of business, and suggested that they go into the concrete block business; that, at the suggestion of the defendant,

they agreed to put in $1,000.00 each and buy the Missouri plant's equipment, with the defendant telling the plaintiff, "We'll take this profit and we'll buy land, we'll buy tools and equipment, and half of it will be yours;" that each of them put in $1,000.00 and went to Missouri and bought that equipment, and using a pole-trailer belonging to the plaintiff, hauled all of the equipment to Tulsa and set it up in the first building, with the plaintiff making three or four trips and doing all of the loading and unloading except on the first trip and doing all of the work necessary to set up the equipment in the first building; that all of the concrete blocks used in the second building were made with this equipment and he helped make those blocks; and that the concrete block business was good and the defendant kept the profits therefrom—about $90.00 a day—in a cigar box.

The plaintiff testified that he designed and built the third building, with part of the materials coming from a building that the defendant bought from Carter Oil Company with block business profits from the cigar box; that, using a winch truck belonging to the plaintiff, he and laborers paid by him with his construction company checks dismantled the building and hauled it to the site; that the plaintiff traded six months' use of a hoist belonging to him for the I-beams and heavy steel that went into the second building; that the extra large overhead doors used in the building belonged to the plaintiff, coming from a dismantling job he did at Tinker Field near Oklahoma City, and were hauled from there by the plaintiff on one of his trucks, with the plaintiff driving; that some of the windows belonged to the plaintiff coming from other dismantling jobs he had done, and the rest of the windows and steel came from a building in Tulsa that the plaintiff bought for removal for $1,200.00 (the remainder of which, he said, the defendant later sold for $5,600.00 or $5,900.00), with the plaintiff furnishing about $1,200.00 worth of labor and equipment use in dismantling the purchased

building, hauling the windows and steel to the tract involved herein, and loading the sold portion for shipment to the purchaser in another state, with the plaintiff receiving nothing for his work and no part of the profits from the transaction; and that, because of bad weather in the winter, it took about nine months to complete the third building.

When asked whether or not, down through the years, the defendant ever made any statement to him concerning the ownership of this property, the plaintiff answered: "No. It was established back in '45 that I was half owner of the land and property. I saved him three times what he could have hired some one else to build it for, the material and supervision;" and, when told that that was not the question but that the question was whether or not, down through the years, the defendant ever mentioned it again after the first time, he answered:

"Well, every time we built a building, he'd state that. He'd state it was the same agreement and that it would be half mine. And the second and third building, he said 'When I'm gone,' he said, 'the other half will go to the girls.' And I said, 'Well, that's—that's all right with me,' my two sisters.

He also testified that his mother died shortly after Easter in 1963; that, during Eastertime of 1963, he went over to see his folks, and his sisters were there too, and, during a conversation then between his mother and him, his mother called the defendant over to where they were and said, "Art owns half of everything, doesn't he?" And the defendant said, "Yes, he does," and his mother said, "Well, the girls will get my half, the other half, when we're gone."

The testimony of one of the sisters concerning this last-mentioned incident was substantially the same as that of the plaintiff, but the other sister's version was slightly different. She testified that their mother said, "You know, Art, this *business* is half yours; and when we pass on, the

rest goes to the girls," and then said, "Daddy, isn't that right?" and the defendant said, "Yes, that's right. This is Art's *business*. And when the girls—when we pass on, the girls get the other half."

Both of the plaintiff's sisters testified that the plaintiff designed the second and third buildings, supervised all of the work thereon, and did a lot of the physical labor done on the buildings, and furnished much of the material that went into the third building, but neither one was asked, or testified, about any special agreement between the plaintiff and defendant concerning either of those buildings.

The plaintiff also testified that, some time after the third building has been completed, the construction of a fourth building on this tract of land was discussed and he spent about two months drawing plans for it; that, because he didn't have a written contract on the second or third buildings and had not received any of the rentals therefrom, he insisted upon something in writing on the proposed fourth building, telling the defendant that he couldn't go on helping him without anything to show for it, and, when the defendant refused to put anything in writing, he refused to construct the fourth building and it never was built.

He also testified that, by 1961, the burial vault business was down to nothing and the defendant tried to give him the burial vault forms, but he refused to take them; that, a little later on, the defendant and a truck driver brought the forms to the plaintiff's place and unloaded them, with the defendant saying, "You can have the forms. You can have everything I've got. I don't want it. I'm out of business. Here it is;" that the plaintiff and his wife operated a concrete burial vault business for about a year, in addition to the plaintiff's construction business and a ready-mix concrete business, and then sold the burial vault business for $10,000.00; and that, even though he figured that the defendant owed him something for his share of the rentals from the property involved herein,

he turned that money over to the defendant, because he was that way and you didn't dare cross him.

In connection with his testimony concerning the settlement of the condemnation proceeding involving the State's taking of a part of the real property involved herein (the first and second buildings and a strip of land along Admiral Boulevard in Tulsa, upon which those buildings faced), the plaintiff was asked if the defendant informed him that he had received the money, and answered:

"Yes, he did. The next day after he received the money, he come in the office. I had my office there. He come in the office and he says 'Art, we're going to split' he said 'I got the money. I put it in Home Federal.' That's how I knew it was there. He said 'I put it in Home Federal,' and he said 'I'm going to give you your share of the money. * * *."

It appears from the testimony that the plaintiff and his family lived in one of the apartments in the first building for a while after that building had been completed, and then moved to another place; that the plaintiff used one of the offices in the first building as his office for quite some time after that building had been completed; that, after the second and third buildings had been completed, they were rented to others, with the defendant receiving all of the rentals and paying all of the taxes, insurance and other expenses, but that, some time between the construction of the third building in 1957 and 1961, when the defendant went out of business, all of the burial vault and concrete block forms and equipment were moved from the first building to the third building and, from then on, the first and second buildings were rented to others, with the defendant receiving all of the rentals and paying all of the taxes, insurance and other expenses; that, from the time he went into the construction business in Tulsa, except during 1947 and 1948, the plaintiff stored his construction equipment and materials left over

from construction and dismantling jobs for others on the tract in question herein and on a ten-acre tract that the defendant purchased, five acres in the name of the plaintiff and five acres in the names of the plaintiff's two sisters (using his own money, according to the defendant, but using profits from the block business cigar box, according to the plaintiff), the title to all of which was later conveyed to the defendant.

The plaintiff testified that, about a month before the commencement of this action, the defendant called him out to that ten-acre tract and told him that he (the defendant) had leased the place to a tenant (then present) who wanted all of the plaintiff's personal property off the premises, and that he would have to get it all off within ten days; that, a little later, the defendant's new wife (whom he had married after the death of the plaintiff's mother in 1963) called him and told him that they were going to sell everything and invest the money in something else and that he would have to get all of his stuff off of both tracts of land within ten days; that he also received a letter from the attorneys for the defendant and his wife, telling him that he would have to get all of his property off of both tracts within ten days; and that that is why he commenced this action.

On cross-examination, the plaintiff testified that, under the original agreement, he was to have a half interest in the property involved herein when he started work on the first building—that is, when he started work on the plans for that building; that it was his understanding that, under that agreement, he was to have his half interest in the property "now," not like his sisters when their mother and father passed away; that the agreement that he was to get half of the rent from the property started with the second building; and that the defendant collected all of the rentals from the property, and, whenever he would ask the defendant about his share of the profits, the defendant would tell him that there weren't any because the taxes and insurance were eating up the rent.

He also testified, on cross-examination, that he never paid any rent or any utility bills on the office or apartment in the first building while he occupied them; that he never paid any taxes or assessments or insurance on the property, and never paid for any repairs on any of the buildings, but, for several years after the first building was completed, did all of the repair and maintenance work on that building and on the burial vault equipment; that he never did file an income tax return, either federal or state, which reflected that he claimed any interest in the property, because he never did receive any income from the property; that, after his mother died in 1963, he received some kind of a notice of a proceeding to terminate his mother's interest in this property as a joint tenant with the defendant, but didn't go into court to complain about it, because he trusted his father; that he didn't do anything about his share of the property or the profits from the property during the period of time involved, because "He kept telling me it's going to be mine. 'When I retire, it's going to be yours.'"

Insofar as the alleged oral agreement and the conversation at Eastertime of 1963 are concerned, the defendant's testimony is reflected by the following questions and answers in the case-made:

"Q. Now, Mr. Riegel, you have heard your son testify here that you wrote him a letter and told him you wanted him to come down here and take charge of your buildings and that you would give him a half interest in all of them. Did you hear him testify to that?

"A. I heard him.

"Q. Will you tell the Judge in your own words what happened, why he came down here, and so forth?

"A. I bought this property, wrote my son a letter and told him that I bought a property to put up a plant in the future. And the first thing I heard, he wrote back and he—and he had a sketch of a pilaster, the

way the building should be built. And the next time I heard from him, he told me that he was laid off and the company had no place to send him and that he'll come down, he's coming down to put up my building.

"Q. Mr. Riegel, did you ever have an agreement with him such as he testified about that you would give him one-half of the land and the buildings?

"A. No, I didn't.

[Objection made and overruled]

"Q. Did you have such a conversation with him?

"A. No, I never did.

"Q. You also heard this testimony of your son and your two daughters about a purported meeting that took place over at your home about Easter time the year your wife died?

"A. Yes.

"Q. Did such a meeting take place over there?

"A. Never did."

The defendant testified that neither he nor their mother sent for either of their daughters; that the two daughters came to Tulsa to live with them because they couldn't make ends meet in Chicago; that, when the plaintiff came to Tulsa in 1945, he told the defendant that he had very little money; that the plaintiff didn't furnish any of the material for the first building and didn't have any equipment then; that he could not recall whether the plaintiff had advanced him any money, or paid for any materials, for the first building; that the plaintiff did furnish a hoist and a winch truck, and possibly two concrete "buggies," for use on the second building, but he (the defendant) furnished the money to the plaintiff to purchase a bulldozer and a concrete mixer; that he never paid the plaintiff anything in connection with any of the three buildings that were constructed on the property involved herein

"Because we had a son and father agreement when he come down; I help you and you help me;" "And that's the story whole through. He helped me and I helped him. I helped the girls. Whatever I did for them, I never expected a dime back and I never got a dime back from any of them." He also testified that the plaintiff did not prepare plans for a fourth building on the property, and that he (the defendant) employed, and paid, a third person, to prepare plans for a fourth building but it never was built.

Except for testimony concerning the construction of the three buildings and the cost thereof to him, and some testimony concerning several outside projects, not involved in this case, in which the plaintiff or one or both of the daughters were interested, and the financing thereof, concerning which they had been allowed to testify, the foregoing is the gist of the defendant's testimony, and he used no other witnesses in his behalf.

We note that, when the plaintiff testified concerning advancements of money made by him to, or for, the defendant in connection with the construction of these three buildings, he stated that he hadn't expected any of the money back because the property was half his anyway. In the face of alleged agreements which did not require the plaintiff to make any such advancements of cash in order to be the owner of an undivided one-half interest in the property in question and entitled to one-half of the net rents and profits from the premises, we think that this testimony by the plaintiff tends to support the defendant's contention that the whole thing, as between the plaintiff and the defendant, was a son and father arrangement—"You help me and I'll help you."

We also note that most of the testimony of the two sisters of the plaintiff, as well as a portion of the testimony by the plaintiff, is given over to matters entirely outside the issues in the case, including, but not limited to real estate and other transactions in which they were interested and

in which their father became involved to some extent, in an apparent attempt to paint the defendant as a selfish, disagreeable person who could not get along with anybody and could not even keep his employees for any length of time. The testimony of the plaintiff's sisters clearly indicates that they had considered all along that they had some kind of a present interest in their father's business, as well as a future interest in this property upon the deaths of their mother and father, so that they did not need to repay any money advanced to, or for, them by their father through the issuance of Cemstone Company checks, and that, by his second marriage and subsequent actions, he was cheating them out of such interests. We think that, in addition to showing the daughters' prejudice against their father at the time of the trial, all of their testimony concerning these extraneous matters tends to support the defendant's contention that, until his second marriage, everything was a family affair with each member of the family doing whatever he or she could do to help the other members of the family, either collectively or individually, without expecting any remuneration other than return of the favor. And, for what it may be worth, we note that two of the witnesses used by the plaintiff on rebuttal had, in the past, worked for the defendant for three years, and for ten or eleven years, respectively, and neither indicated that he had ever had any trouble getting along with the defendant.

Applying the rule that, for the safety of titles, the existence of a constructive trust must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to lead to but one conclusion, or as to leave no reasonable doubt as to the existence of the trust, we have examined the entire record in this case and find that the judgment of the trial court against the existence of the alleged constructive trust in favor of the plaintiff is not clearly against the weight of the evidence or contrary to law or established principles of equity. This makes it unnecessary for us to consider the questions concerning the statute of frauds and the statute of limitations.

Judgment affirmed.

IRWIN, C. J., and DAVISON, WILLIAMS, BLACKBIRD, JACKSON, HODGES and McINERNEY, JJ., concur.