Ida B. MARSHALL, H. G. Marshall and H. G. Marshall, Inc., Plaintiffs in Error,

v.

H. D. AMOS, Sinclair Oil and Gas Company and Sinclair Crude Oil Company, as successor in interest to Sinclair Oil and Gas Company, Defendants in Error.

No. 36936.

Supreme Court of Oklahoma.

April 16, 1970.

Rehearing Denied July 15, 1970.

Jack L. Spivey and Paul Pugh, P. M. Williams, Oklahoma City, for plaintiff in error, Ida B. Marshall.

Charles R. Nesbitt, Robert N. Naifeh, Oklahoma City, for defendants in error.

IRWIN, Chief Justice.

This is the second time this case has been submitted for consideration on its merits. In 1956, an opinion was promulgated reversing the judgment of the trial court (Marshall v. Amos, Okl., 300 P.2d 990) and mandate was issued. In 1967, Amos filed a Petition for Review in this Court and the relief sought was the recall of the mandate and vacation of the decision in Marshall v. Amos, Okl., 300 P.2d 990. In Marshall v. Amos (1968), Okl.,

442 P.2d 500, this Court determined that the first decision was not constitutionally adopted; recalled the mandate that was issued therein; vacated and set aside the decision; and ordered that the cause be reinstated on the dockets of this Court for hearing and disposition on its merits. The parties have filed supplemental briefs and the case now stands submitted.

Subsequent to the promulgation of 442 P.2d 500, H. D. Amos, defendant in error, died and a Motion for Revivor was filed. The action of H. D. Amos has been revived in the name of Moselle T. Amos, Administratrix of the Estate of H. D. Amos, deceased.

The action was commenced in May, 1953, by H. D. Amos, against H. G. Marshall and Ida B. Marshall, husband and wife, and H. G. Marshall, Inc., Titus Haffa, Ethel Haffa, A & P Developing Company, a co-partnership, and Sinclair Oil and Gas Company, as defendants. Briefly stated, Amos alleged and sought to establish that he and H. G. Marshall entered into an oral joint venture to negotiate the sale of an oil and gas lease and to share equally in the profits from the sale; that they negotiated the sale to Titus Haffa; that part of the profits realized by the joint venture in negotiating the sale was an undivided ⅛th of ⅝ths overriding royalty interest; that Titus Haffa assigned the overriding royalty interest to Ida B. Marshall and not to him and H. G. Marshall; that this assignment was without consideration; that fraud had been practiced upon him; and that Ida B. Marshall, as trustee for his use and benefit, held title to an undivided one-half interest in the overriding royalty interest. Amos also sought an accounting.

The action was defended on the grounds that Amos and Marshall did not enter into a joint venture to negotiate the sale of the oil and gas lease; that Haffa was under no moral or legal obligation to Marshall or Amos in connection with the sale of the oil and gas lease; and that the assignment from Haffa to Ida B. Marshall of the overriding royalty interest was a gift and was separate and apart from the sale of the oil and gas lease.

The primary issue presented was whether the assignment of the ⅛th of ⅝ths overriding royalty interest was a gift to Ida B. Marshall, or whether such assignment was actually payment for services rendered to Titus Haffa by H. G. Marshall with Ida B. Marshall taking title thereto as trustee. The assignment in question was made in January, 1952, by Titus Haffa to Ida B. Marshall, and the same was filed for record in October, 1952.

The trial court sustained a demurrer to the evidence as to Haffa, Ethel Haffa and A & P Developing Company, and dismissed the action against them. No appeal was lodged challenging this dismissal. Thereafter, the trial court made extensive findings of fact and conclusions of law. In its conclusions of law the trial court found that Amos and H. G. Marshall had entered into the oral joint venture; that pursuant to the oral agreement they negotiated the sale of the oil and gas lease to Haffa; that a part of the profits was the overriding royalty interest assigned to and held in the name of Ida B. Marshall; and that fraud had been practiced upon Amos by H. G. Marshall and Ida B. Marshall.

The trial court ordered an accounting and decreed that Amos was the owner of an undivided one-half interest in the overriding royalty held in the name of Ida B. Marshall. Thereafter, H. G. Marshall, Ida B. Marshall and H. G. Marshall, Inc., perfected an appeal from the order overruling their motion for a new trial. Although H. G. Marshall and H. G. Marshall, Inc., were represented in this Court when 300 P.2d 990 was promulgated, they failed to appear in any of the proceedings after the Petition for Review was filed by Amos, although duly served with proper notice.

We affirm the judgment of the trial court and will set forth the pertinent circumstances established by competent evidence which supports the judgment of the

trial court and our affirmance of that judgment on appeal.

Sinclair Oil and Gas Company was made a party defendant because it was purchasing the oil produced from the oil and gas lease. During the pendency of the action Sinclair Crude Oil Company became the successor of Sinclair Oil and Gas Company and it was merely a stakeholder as to the oil runs held in suspense.

Titus Haffa was the managing partner of A & P Developing Company, a co-partnership. Although A & P Developing Company purchased the oil and gas lease involved in this action, since Titus Haffa was its managing partner, any reference to Haffa about purchasing a lease or agreeing to purchase a lease will include A & P Developing Company.

H. G. Marshall is president and Ida B. Marshall is secretary of H. G. Marshall, Inc. Although some of the documents herein referred to may have been directed to or were executed on behalf of H. G. Marshall Inc., unless H. G. Marshall, Inc., is specifically mentioned as such, any reference to H. G. Marshall, Inc., acquiring an interest, etc., will include H. G. Marshall.

The record discloses that Amos and H. G. Marshall had known each other for several years, had done business together, and each was interested in some phase of the oil and gas business. In the early part of 1950, Amos learned through a seismograph employee that the minerals under the tract of land here involved might be for sale. Amos checked the records and found that the mineral interest was broken up in small units and he felt the price would be too high to be profitable. He did learn that certain men, who were associated together, held oil and gas leases on several acres of the minerals. These men will be referred to as Soper, and any reference to Soper will include him and/or his associates.

Amos testified that in the summer of 1950, Marshall told him that " * * * if I would find a lease that I thought would produce oil in the Wilcox sand, that he and I would own it jointly together—whatever

profit we made out of it. He would take me to Chicago and introduce me to Mr. Haffa and we would make a drilling deal on any lease that I thought would produce in the Wilcox sand." He further testified that the word "Wilcox" had a particular significance to him because of the previous conversation he had with the seismograph employee; that he did not mention the tract of land to Marshall but contacted Soper to determine if the leases were available and found that they were; that Marshall later asked him if he found any leases and he told him he had and told him the owners; and that he made an appointment for him and Marshall to discuss the matter with Soper.

Marshall testified that Amos approached him and said he (Amos) knew where there was a prospective lease with merits and wanted to find some place for it but did not tell him the location; and that Amos later contacted him and the arrangements were made to meet with Soper to discuss the sale of the leases.

Marshall and Amos did meet with Soper and on September 5, 1950, Soper addressed a letter to Marshall to the effect that: "they (Soper and his associates) owned leases covering 116 acres of minerals under the quarter section involved; that in the event Marshall would pay $23,200.00 on or before September 12, 1950, they would deliver the leases subject to an undivided 1/16th of 7/8ths overriding royalty interest." It is to be noted that $23,200.00 for the 116 acres equals $200.00 per acre. On the same day Soper also agreed by a letter addressed to Marshall to pay a commission of $12.50 an acre, which, in effect, reduced the price to $187.50 an acre.

Amos testified that the reason the offers contained in the above letters were addressed to Marshall instead of to him was because Marshall said that in order to get the deal over, he would have to have a letter addressed to him to show Haffa that he had the lease in his name; that when the question came up, one of Soper's associates said, "Marshall, I won't give you a

letter", but said that he would give the letter to him (Amos); that he (Amos) saw the deal was going to close in their face and said to go ahead and give the letter to Marshall; and that he (Amos) also said that "whatever we get out of the lease we will split fifty-fifty", and Marshall said, "that is right."

One of Soper's associates who attended the meeting when the letters were given to Marshall, testified that a Mr. C, another one of Soper's associates "didn't much want to give the letter to Marshall", but Amos said, "go ahead and give the letter to Marshall, that they were going to Chicago together and would get the money."

Amos also testified that Marshall told him that he needed some more geological information to get the deal over; that he contacted the seismograph employee and he and Marshall discussed the potential productivity of the property and that the seismograph employee gave Marshall a seismograph map.

On September 9, 1950, Amos and Marshall went to Chicago, each paying his own traveling expenses. The purpose of the trip was to sell the leases to Haffa. Haffa was a man of substantial means, had made previous oil and gas deals with Marshall, and had operated in Oklahoma. After introducing Amos to Haffa, Amos remained in an outer office and only Marshall discussed the purchase of the leases with Haffa in Haffa's office. At this meeting Haffa agreed to pay $48,000.00, or $300.00 per acre on the entire 160 acres, plus an overriding royalty interest of ⅛th of the ⅝ths. Haffa gave Marshall a check for $48,000.00 payable to the Liberty National Bank in Oklahoma City, and authorized his attorney in Oklahoma City to prepare the proper contracts and escrow agreements. Marshall did not tell Haffa what he (Marshall) would have to pay for the leases and the profits he would make if the sale were consummated. Marshall did advise Amos of the deal he had made with Haffa and showed him the $48,000.00 check.

A Mr. W, who had known Amos and Marshall for several years, was called as a witness for Amos. He testified that sometime after the middle of the year, 1950, he stopped by the office of Amos; that Marshall was there; that he asked Amos where he had been and Amos said he and Marshall had just returned from Chicago; and that Marshall "pulled out a check to show me, a $48,000.00 check, and said they had just made a big deal." Mr. W was not certain to whom the check was made payable, but he recalled the incident because "$48,000.00 makes a big impression on me."

Amos testified that he asked Marshall for a letter or memorandum concerning their agreement before they went to Chicago and Marshall said, "It is not necessary. Wait until we see what we are going to make out of it first." Amos was asked if this satisfied him and Amos testified that " * * * as long as I was going to Chicago with him I thought it would be all right."

Marshall introduced into evidence a release signed by him in favor of Haffa which was executed while Amos and Marshall were in Chicago, and also a release dated the same day signed by H. G. Marshall as President of H. G. Marshall, Inc., and signed by Ida B. Marshall as Secretary. Marshall did not advise Amos of these releases or their contents. The releases acknowledged that Haffa had purchased the leases for $48,000.00 subject to an overriding royalty interest of ⅛th of the ⅝ths; and that Haffa had paid Marshall $1,000.00 for his services in the purchase. The record discloses that Ida B. Marshall, executed the release of H. G. Marshall, Inc., as its secretary in Oklahoma City and returned it to Haffa in Chicago.

On September 13, 1950, Haffa's Oklahoma City attorney and agent entered into a written Memorandum Agreement with Soper. It was executed on September 14, 1950, and will be referred to as the September 14, 1950, Agreement or the Haffa-

Soper agreement. In this agreement Soper was required to deliver leases on a minimum of 145 acres on or before September 25, 1950; title had to be approved by Haffa's attorney; and Haffa was to deposit $48,000.00 in escrow in the Liberty National Bank and Haffa agreed to pay $300.00 bonus per acre. In this memorandum agreement, Soper reserved a ⅛th of ⅞ths overriding royalty interest. The bonus and overriding royalty interest that Soper was to receive under this memorandum agreement were subject to the claims of Marshall as shown in the following paragraph.

In a letter dated September 13, 1950, from Soper addressed to Marshall, the Haffa-Soper Memorandum Agreement was mentioned and the terms thereof were briefly set forth. In this letter Soper agreed to pay Marshall $112.50 per acre as compensation for negotiating the sale and purchase of the oil and gas leases and agreed to assign to him an overriding royalty interest equal to the difference between ¹/₁₆th of ⅞ths and ⅛th of ⅞ths. The letter also stated that this letter was in lieu of and superseded the letters of September 5, 1950, from Soper to Marshall heretofore mentioned.

The terms of this letter neither enlarged nor diminished what Marshall or Soper were to receive under the September 5th letters and the offer of Haffa. This subsequent letter merely brought all the agreements together in one instrument as between Soper and Marshall.

Soper was unable to obtain leases on 145 acres on which Haffa's attorney would approve title before September 25, 1950, as provided in the Haffa-Soper Memorandum Agreement of September 14, 1950, and no cash was released by the escrow bank. Soper contended that he had met the title requirements. In the meantime, an offset well was being drilled and reports were out that such well had failed to produce.

Haffa came to Oklahoma City in October, 1950, and demanded that his $48,000.00 placed in escrow be released. Soper, believing he had met the requirements of the September 14, 1950, Memorandum Agreement with Haffa, wanted to enforce its provisions but Marshall declined to become involved in a court action against Haffa. However, on September 18, 1950, Soper finally agreed to accept $15,500.00 for such leases that he had and to retain an overriding royalty interest of ¹/₁₆th of ⅞ths in lieu of ⅛th of ⅞ths as provided for in the Haffa-Soper Memorandum Agreement. It appears that the $15,500.00 was payment for leases on 124 acres at $125.00 per acre. In other words, in the compromise agreement Soper was to receive $125.00 an acre instead of $187.50 an acre, and the same overriding royalty interest of ¹/₁₆th of ⅞ths that he would have been ultimately entitled to receive had the original agreements been consummated.

In reference to the compromise agreement, Marshall testified that he worked the deal out and had arranged for Haffa to get back $29,000.00 since he got it tied up for him. Before the compromise agreement between Haffa and Soper was entered into, H. G. Marshall and H. G. Marshall, Inc., executed a release on October 13, 1950. The release of H. G. Marshall, Inc., was attested by Ida B. Marshall, as its secretary. This release recited, in effect, that on the 13th day of September, 1950, H. G. Marshall, Inc., entered into a letter contract with Soper in connection with the sale of the oil and gas lease to Haffa; that it was the desire of the parties to compromise and settle their controversies; and that H. G. Marshall, Inc., and H. G. Marshall, personally discharged and released any claim to any money that may have accrued or may accrue by reason of the sale. The last paragraph of the release is as follows:

"It is understood and agreed, however, that the undersigned does not release any right, title and interest in and to the overriding royalty interest to which H. G. Marshall, Inc., is entitled to under the contract first in above referred to."

In comparing and analyzing the above release with the September 13, 1950, agreement Marshall had with Soper, and Mar-

shall's agreement with Haffa, had the original agreements been consummated Marshall would have received $18,000.00 in cash and the difference between ⅟₁₆th of ⅞ths and ⅛th of ⅞ths overriding royalty interest. In this release Marshall released his claim to the $18,000.00. Whether this release constituted a release and satisfaction of the overriding royalty interest will be considered later.

Marshall testified that the last paragraph in the release was "put in there as a matter of protection. I released all the money so Haffa, the client I had interested in the deal, could get his money down and the other boys could get their cost and profit out of it. I put that clause in there because I released everything so far as cash consideration that was coming to H. G. Marshall, Inc., if additional acreage was bought and turned to * * * Titus Haffa on the basis of ⅛th override. I wanted a protection." Marshall further testified that he did not have any understanding or agreement of any kind with Haffa in connection with his receiving anything from him from these oil and gas leases because "I signed releases at the time I made a deal with him." It is to be noted that the release referred to relates to the first release executed in Chicago when Haffa paid Marshall $1000.00 and Haffa had agreed to pay $300.00 an acre for the leases, subject to a ⅛th of ⅞ths overriding royalty interest.

Amos testified that he knew that some controversy had come up between Soper and Haffa; that he did not know about nor attend the meetings whereby the parties were trying to work out a settlement; that he discussed it with Marshall before the October 18, 1950 compromise agreement had been made; and that Marshall told him "not to worry, that everything was all right," and that we "were going to make more out of the deal since it didn't go over like it was originally; that we would obtain a larger interest this way than before."

Amos further testified that after the compromise agreement had been made, he and Marshall discussed the matter and Marshall told him that they had some money made and as soon as Mr. Haffa gave him the assignment he would give him his one-half. Amos also testified that when the well was being drilled he and Marshall went to the drill site; that every time they were together he would ask Marshall when he was going to get his interest and Marshall said, "The old man (Haffa) has not given me my interest, and as soon as he does, I will come around and give you your half, * * *."

Marshall testified that he had never discussed with Amos anything about any division of the profits of the transaction except that Amos was to receive the $12.50 commission. In reference to the commission, Amos testified: "Do you think I would go to Chicago for a lousy $12.50 an acre."

On January 2, 1952, Haffa assigned to Ida B. Marshall a ⅛th of ⅞ths overriding royalty interest in the leases. A well was commenced on the leasehold estate in July, 1952. This assignment was recorded on October 14, 1952. It is one-half of this overriding royalty interest and the money received for the production therefrom that are involved in this litigation.

Defendants first contend that the judgment of the trial court that a joint venture existed between Amos and Marshall is clearly against the weight of the evidence.

An action to establish a joint venture is one of equitable cognizance. In such actions this Court will examine the record and weigh the evidence, but unless the judgment rendered is clearly against the weight of the evidence it will not be disturbed on appeal. Boatman v. Beard, Okl., 426 P.2d 349.

■ The record conclusively discloses that Amos and Marshall entered into some kind of agreement, but the evidence concerning the terms of that agreement is in conflict. Amos testified that they agreed to share equally in any profits realized from the agreement and Marshall testified that no agreement was made to share in

the profits but that Amos was to receive only $12.50 an acre commission. The record conclusively shows that Amos located the prospective lease; ascertained the owners and arranged the meeting for the possible purchase of the lease from the owners; and accompanied Marshall to Chicago, each paying his own expenses, and returned with him after Haffa had agreed to purchase the lease. Considering these factors together with the other evidence set forth, we conclude and hold that the trial court's judgment that a joint venture existed between Amos and Marshall is not against the clear weight of the evidence.

■ Defendants next contend that the Haffa-Soper compromise agreement of October 18, 1950, (whereby Soper accepted $15,500.00 and a 1/16th of 7/8ths overriding royalty interest for the leases) constituted an accord and satisfaction and substitution of a new agreement and terminated all rights of either party under the former agreement.

Although the October 18, 1950, agreement between Soper and Haffa may have constituted an accord and satisfaction between them and neither could have asserted any rights under their original agreement of September 14, 1950, against each other, this does not necessarily mean that such agreement terminated or divested Marshall (which also includes Amos) of all his rights.

In considering the effect of the compromise agreement it seems pertinent to review what Soper lost by the compromise; what Haffa gained by the compromise; and what Marshall lost if such compromise terminated all his rights. Soper compromised only the amount to be received as bonus for the lease and this amount was the difference between $187.50 per acre and $125.00 per acre, or $62.50 per acre. The compromise agreement did not reduce Soper's overriding royalty interest because he was to receive ultimately only 1/16th of 7/8ths overriding royalty interest under the original agreement and he received this under the compromise agreement. By such

compromise agreement, Haffa purchased the lease for $125.00 per acre instead of $300.00 per acre, or a difference of $175.00 per acre, and also reduced the amount of overriding royalty interest that the leases were subject to from 1/8th of 5/8ths under the original agreement to 1/16th of 7/8ths.

Had the original agreement been consummated, Marshall would have received the difference between $187.50 per acre (the amount for which Soper agreed to sell the leases) and $300.00 an acre (the amount Haffa agreed to pay for the leases) or $112.50 per acre, and also an overriding royalty interest amounting to the difference between 1/16th of 7/8ths (the interest reserved by Soper) and 1/8th of 5/8ths (the overriding royalty interest that Haffa agreed that the leases would be subject to). Defendants, in effect, argue that Marshall did release all his rights above set forth in order that Soper could sell the leases to Haffa.

In our opinion, the compromise agreement between Soper and Haffa did not terminate all the rights and benefits to which Marshall was entitled. Before the October 18, 1950, compromise agreement could be made, Marshall's rights had to be considered and on October 13, 1950, Marshall executed the release heretofore mentioned. Although this release may have released any claim he may have had in the funds escrowed, it specifically did not release any right in and to the overriding royalty interest to which he was entitled to under the contract. The overriding royalty interest that he was entitled to under the contract was the difference between a 1/16th of 7/8ths and 1/8th of 5/8ths.

Defendants argue that after the compromise agreement had been made, Haffa was under neither legal nor moral obligations to Marshall or any other person and had a perfect right to give or dispose of the leasehold estate as he saw fit, and that the assignment of the overriding royalty interest to Mrs. Marshall was a gift.

The real issue to be resolved is not whether Haffa had the legal right to dis-

pose of his property as he saw fit, but whether the assignment of the ⅛th of ⅝ths overriding royalty interest was a gift to Mrs. Marshall, or was it in fact a legal obligation to Marshall for his services in working out the compromise agreement as Marshall testified he "worked the deal out". In this connection it is to be noted that Marshall, in working out the deal, released his claim to $112.50 per acre that he would have received had the original contract been consummated but in the same instrument reserved his rights to the override under the contract.

There was evidence submitted that Haffa had given several expensive gifts to Mrs. Marshall, including a car. Haffa testified that he didn't owe anything to Marshall; that Marshall owed him; and that the assignment of the overriding royalty interest was a gift to Mrs. Marshall.

The trial court found that the true consideration for the assignment by Haffa to Mrs. Marshall was in payment for services rendered by the joint venture of Amos and Marshall in negotiating the sale and purchase of the leases; that no actual consideration passed from Mrs. Marshall to Haffa for said assignment; that she took title for the use and benefit of Amos and Marshall, each owning an undivided one-half interest; that Marshall had exercised jurisdiction and control over it by mortgaging the same and using the proceeds for his use and benefit; and that the actions of Mr. and Mrs. Marshall amounted to fraud and they and each of them should account to Amos for his one-half interest.

Mrs. Marshall received the assignment of the overriding royalty interest in January, 1952, and filed it of record on October 14, 1952. Although it is argued that the overriding royalty interest and the proceeds from the production were Mrs. Marshall's separate property and that Marshall did not exercise any control over it, the record discloses that: In December, 1953, the overriding royalty interest was mortgaged for $25,000.00. The mortgage was negotiated in Wichita Falls and Mrs. Marshall testified that Mr. Marshall went to Wichita Falls and negotiated it. The trial of this case was in March, 1954. When asked if she used the $25,000.00, she said "yes" but did not remember for what purpose.

Amos testified that when he and Marshall returned from Chicago they went to Marshall's home; that when they got in the house, Mrs. Marshall asked: "Well, did you make a deal?"; and that Mr. Marshall answered, "yes, we did. We brought back $48,000.00 and it looks like Amos and I have $18,000.00 cash and one-eighth royalty."

Mr. and Mrs. Marshall both denied that the trip to Chicago and the results of that trip were ever discussed in the presence of Mrs. Marshall and Mr. Marshall testified that he had never discussed with Mrs. Marshall in reference to giving Amos any interest in the deal. Both testified that Amos had been in their home several times.

The trial court, in its conclusions of law, found that Marshall realized a secret profit from the joint venture in that he induced Haffa to assign the overriding royalty interest to Ida B. Marshall; that fraud had been practiced upon Amos by H. G. Marshall and Ida B. Marshall; and that when Ida B. Marshall took title to the overriding royalty interest, she took title as trustee for the use and benefit of the joint venture.

In Perdue v. Hartman, Okl., 408 P.2d 293, we held:

"A mere preponderance of the evidence is not sufficient to establish a constructive trust but it must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to leave but one conclusion, or as to leave no reasonable doubt as the existence of the trust."

In Peyton v. McCaslin, Okl., 417 P.2d 316, we said:

" * * * The onus of establishing a constructive trust lies upon him who seeks its enforcement, and before a court

will be warranted in making a decree therefor, the evidence must be clear, unequivocal and decisive. But each trial, like each case, must be considered in the light of its own peculiar developments and circumstances, and, accordingly, the rule must be applied intelligently. As the well-known axiom states, the preponderance of the evidence does not mean the greater number of witnesses testifying to a fact, but means that which, to the mind of the trier of the fact, or the seeker of the truth, seems most convincing and more probably true."

In Morris v. Leverett, Okl., 434 P.2d 912, we held "Constructive Trusts" are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it.

In Regal v. Riegel, Okl., 463 P.2d 680, we said:

"In an action of equitable cognizance, this court will examine the whole record and weigh the evidence and affirm the judgment of the trial court unless clearly against the weight of the evidence or contrary to law or established principles of equity; and, where a certain fact is required to be established by proof of a certain degree or character, the two rules must be taken and considered together, and, in such cases, this court will, in weighing the evidence, determine whether or not the proof conforms to the required standard. Nisbet v. Midwest Oil Corporation (Okl.1968) 451 P. 2d 687."

In Hitt v. Hitt, Okl., 258 P.2d 599, we held that it is for the trial court in a case of equitable cognizance to determine the credibility of the witnesses and the weight and value to be given to the testimony.

We have examined the entire record and find that the trial court's judgment decreeing that Ida B. Marshall took title, as trustee, to an undivided one-half of the ⅛th of ⅝ths overriding royalty interest, for the use and benefit of Amos, is not clearly against the weight of the evidence or contrary to law or established principles of equity and is sustained by clear, cogent and convincing evidence.

Defendants contend that by allowing Amos an undivided one-half interest in the ⅛th of ⅝ths overriding royalty interest that such amount was approximately twice the interest in the lease which he could have received if the original agreement between Soper and Haffa had been consummated.

If the original agreement had been consummated, Amos would have received ½ of the profits received, which would have been ½ of the cash received and the cash to be received was $112.50 per acre; and an undivided one-half interest in an overriding royalty interest which is the difference between ⅟₁₆th of ⅞ths and ⅛th of ⅝ths. Apparently when the compromise agreement was worked out and Haffa assigned the overriding royalty interest, the prospective value of the override was somewhat less than subsequent events proved it to be. Haffa testified that if he listed the ⅛th of ⅝ths overriding royalty interest as a gift for tax purposes, it would have been " * * * $2,500.00, what it cost me * * *."

In our opinion, the judgment of the trial court allowing Amos an undivided one-half interest in ⅛th of ⅝ths overriding royalty interest is not against the clear weight of the evidence.

Judgment affirmed.

REDMAN, V. C. J., and CANNON, RIDDLE, CAIN, RAINEY, HODGES, LAVENDER and McINERNEY, JJ., concur.

Vice Chief Justice BERRY and Justices WILLIAMS, BLACKBIRD, DAVISON and JACKSON, having certified their disqualifications in this case, the Honorable JOHN R. CAIN, Oklahoma City, Honorable CALVERT L. CANNON, Ada, Honor-

able ANDREW B. RIDDLE, JR., Ardmore, Honorable DALE R. RAINEY, Okmulgee, and Honorable MANVILLE REDMAN, Lawton, were appointed Special Justices in their stead.