**LINCOLN BANK AND TRUST COMPA-NY, an Oklahoma banking corporation, and the Oklahoma Bankers Association, a non-profit corporation, Appellees,**

v.

**OKLAHOMA TAX COMMISSION, Appellant.**

**Nos. 70071, 67635.**

Supreme Court of Oklahoma.

Feb. 11, 1992.

bank has failed to report property deemed abandoned by the Uniform Disposition of Unclaimed Property Act (60 O.S.1981 § 651 et seq.)? (2) Does the Financial Privacy Act (6 O.S.1981 § 2201 et seq.) pose a barrier to the Commission's search for unreported abandoned property via its own administrative process? and (3) Did the Oklahoma Tax Commission have a legally sufficient reason to believe that the appellee/bank had failed to comply with the reporting requirements of the Uniform Disposition of Unclaimed Property Act? We answer the first and third questions in the affirmative, and the second in the negative.

Peter G. Pierce, III, Carson, Rayburn, Pierce & Mueller, Oklahoma City, for appellee Lincoln Bank & Trust Co.

Laura N. Pringle, Pringle & Pringle, P.C., Oklahoma City, for appellee Oklahoma Bankers Ass'n.

Peter G. Pierce III, Mary Beth Guard, Gen. Counsel, for appellee Oklahoma Bankers Ass'n.

J. Lawrence Blankenship, Gen. Counsel and Donna E. Cox, Asst. Gen. Counsel, Oklahoma Tax Com'n, Oklahoma City, for appellant in Cause No. 67635.

Joe Mark Elkouri, Gen. Counsel, Dorothy J. Lindsey, and Gladys E. Cherry, Asst. Gen. Counsel, Oklahoma Tax Com'n, Oklahoma City, for appellant in Cause No. 70071.

OPALA, Chief Justice.

The issues to be decided are: (1) Does the district court have jurisdiction to inquire into the underlying basis for administrative process by which the Oklahoma Tax Commission seeks to inspect a state bank's financial records upon the belief that the

I.

THE CRITICAL FACTS IN LITIGATION

In a letter dated August 26, 1986 the Oklahoma Tax Commission (Commission) notified Lincoln Bank and Trust Company (Lincoln or Bank)[1] of its intent to inspect certain financial records and documents kept by the Bank. The Commission said it "had reason to believe" the Bank was holding *unreported* property presumed abandoned by the Uniform Disposition of Unclaimed Property Act (60 O.S.1981 § 651 et seq.) (Unclaimed Property Act or Act).[2] According to the letter, Lincoln was believed to have failed to comply with the Act because (a) "[n]o reports [were] on file for 1978 and 1979, with negative reports filed for 1980 and 1981"; (b) "[i]tems reported consistently by other comparably sized banks have not been reported by Lincoln Bank & Trust" and (c) "[its] reporting history is not consistent with other comparably sized banks."

The Unclaimed Property Act provides a comprehensive scheme for the reporting,[3]

---

1. References through this opinion to "Lincoln" and to "Bank" include Lincoln's co-appellee, the Oklahoma Bankers Association.

2. According to the terms of 60 O.S.1981 § 678, infra note 41, the Oklahoma Tax Commission must have "reason to believe that [a] ... person has failed to report [abandoned] property" before it may examine that person's records.

3. See 60 O.S.Supp.1982 § 661, whose pertinent terms provide:

"A. *Every person holding funds or other property* tangible or intangible, presumed abandoned under the Uniform Disposition of Unclaimed Property Act *shall report to the Oklahoma Tax Commission with respect to the property* as hereinafter provided.

collection,[4] maintenance,[5] distribution[6] and escheat[7] of tangible and intangible property deemed abandoned by its provisions. All property presumed abandoned must be reported[8] and, if not earlier claimed by the owner, delivered to the Commission by the holder.[9] Banks are among the several types of holders whose unclaimed property is specifically governed by the act.[10]

"B. The report shall be verified and shall include:

"1. The name, if known, and last-known address, if any, of each person appearing from the records of the holder to be the owner of the property of the value of Fifty Dollars ($50.00) or more presumed abandoned under the Uniform Disposition of Unclaimed Property Act;

" * * *

"3. The nature and identifying number, if any, or description of the property and the amount appearing from the records to be due ...; and

"4. The date when the property became payable, demandable or returnable, and the date of the last transaction with the owner with respect to the property.

" * * *

"D. The report *shall be filed before November 1 of each year* as of September 1 next preceding.... The Oklahoma Tax Commission may postpone the reporting date upon written request by any person required to file a report. " * * * " (Emphasis added.)

**4.** See 60 O.S.1981 § 663, whose pertinent terms provide:

"Every person who has filed a report ... *shall* within twenty (20) days after the time specified in Section 12 for claiming the property from the holder ... *pay or deliver to the Commission all abandoned property specified in the report* after first deducting therefrom expenses incurred in the mailing of notices required by Section 11(e). * * * " (Emphasis added.)

**5.** See, e.g., 60 O.S.1981 § 668 and 60 O.S.Supp. 1984 § 669, whose pertinent terms are:

"[§ 668] There is hereby created in the State Treasury the 'Unclaimed Property Fund,' the principal of which shall constitute a trust fund for persons claiming any interest in any property delivered to the state under this act.... All funds received under this act ... *shall forthwith be deposited by the Oklahoma Tax Commission in the Unclaimed Property Fund....*

" * * *

"[§ 669] *The Oklahoma Tax Commission is hereby vested with authority and the responsibility for the control and management of all monies in the Unclaimed Property Fund....* It shall be the duty of said Commission to take such steps as may be necessary to preserve the principal of monies accruing to the Unclaimed Property Fund as a trust for persons claiming any interest in any property delivered to the state pursuant to the provisions of the Uniform Disposition of Unclaimed Property Act." (Emphasis added.)

**6.** See 60 O.S.1981 § 675, whose pertinent provisions are:

"(a) The Oklahoma Tax Commission shall consider any claim filed under this act....

"(b) Upon approval by the Oklahoma Tax Commission *the claim shall be paid forthwith from the Unclaimed Property Fund.* * * * " (Emphasis added.)

**7.** See 60 O.S.Supp.1984 § 670, whose pertinent terms provide:

"The Oklahoma Tax Commission shall determine, from time to time, what amount of unclaimed property in its custody should be retained as a reserve....

" * * *

"The Commission, after having found and determined the reserve necessary ... shall pay all amounts in its custody in excess of said necessary reserve into the State Treasury to the credit of the General Revenue Fund. *"When monies are deposited to the credit of the General Revenue Fund, all rights of any owner of unclaimed property to resort against the money so paid into the General Revenue Fund shall terminate...."* (Emphasis added.)

**8.** See 60 O.S.Supp.1982 § 661, supra note 3.

**9.** See 60 O.S.1981 § 663, supra note 4.

**10.** See 60 O.S.Supp.1982 § 652, infra. In addition to banks, the Act specifically embraces other types of holders, including, for example, life insurance corporations (60 O.S.Supp.1982 § 653), utilities (60 O.S.Supp.1982 § 654), business associations (60 O.S.Supp.1990 § 655), fiduciaries (60 O.S.Supp.1982 § 656) and the courts (60 O.S.1981 § 657).

The pertinent terms of 60 O.S.Supp.1982 § 652 provide:

*"The following property held or owing by a banking or financial organization is presumed abandoned:*

"1. *Any demand, savings, or matured time deposit* made in this state with a banking organization, together with any interest or dividend thereon, excluding any charges that *may lawfully be withheld, unless the owner has, within seven (7) years:*

a. increased or decreased the amount of the deposit, or presented the passbook or other similar evidence of the deposit for the crediting of interest, or

b. corresponded in writing with the banking organization concerning the deposit, or

A second letter from the Commission dated September 9, 1986 notified Lincoln of an "Opening Conference" during which it was to have made available to the Commission various documents, e.g., the general ledger, prior unclaimed property reports and records of dormant or inactive accounts, if maintained.[11] Lincoln refused to produce any of the requested materials and brought this suit to quash, by injunctive relief, the Commission's administrative process for inspection of financial records. After a hearing, the district court first issued a preliminary injunction barring the Commission from examining Lincoln's records pending determination of the quest

for a permanent injunction, which was later issued upon trial on the merits of the case.

■■■■ The Commission appeals from both the interim order in Cause No. 67,635 and from the permanent injunction decree in Cause No. 70,071. The issues tendered in the first appeal need not be considered today. When the trial court issued its final decree, the correctness of the temporary order, which merely operated to preserve the status quo pending trial, became a moot issue. A final decree supersedes any temporary or interlocutory order rendered during the suit's pendency.[12] Today's opinion hence concerns itself with issues found to govern Cause No. 70,071.[13]

c. otherwise indicated an interest in the deposit as evidenced by a memorandum on file with the banking organization;
" * * *
"5. *Any sum payable on checks certified in this state or on written instruments issued in this state on which a banking or financial organization is directly liable, including, by way of illustration but not of limitation, certificates of deposit and drafts, that has been outstanding for more than seven (7) years from the date it was payable, or from the date of its issuance if payable on demand, unless the owner has within seven (7) years corresponded in writing with the banking or financial organization concerning it, or otherwise indicated an interest as evidenced by a memorandum on file with the banking or financial organization;*
"6. *Any sum payable on a travelers' check, unless the owner has within fifteen (15) years corresponded in writing with the banking or financial organization concerning it....*
"7. *Any funds or other personal property, tangible or intangible, removed from a safe deposit box or any other safekeeping repository or agency, or collateral deposit in this state on which the lease or rental period has expired due to nonpayment of rental charges ... that have been unclaimed by owner for more than seven (7) years from the date on which the lease or rental period expired....*" (Emphasis added.)

11. The following is a complete list of the documents and financial records that the Oklahoma Tax Commission requested Lincoln to produce:
"1. Bank's prior unclaimed property reports to the State of Oklahoma, including supporting workpapers.
"2. General Ledger Chart of Accounts, including subsidiary accounts.
"3. Glossary or definition of accounts.

"4. Detailed General Ledgers for 1982, 1983, 1984, January 1, 1985, through August 31, 1985, and the accompanying daily transaction journals.
"5. Year-end trial balance for 1978 and 1985.
"6. Copies of any Committee Minutes or Board of Director Minutes which relate to unclaimed property or abandoned property.
"7. Copy of Company's most current 10–K and Annual Report, if publicly held.
"8. Copy of any legal opinions the Company is relying on for unclaimed property reporting obligations.
"9. Copy of any written policies and procedures utilized by the Company in filing unclaimed property reports.
"10. Outstanding and unclaimed check (i.e., cashiers, expense, oil & gas rental, etc.) or draft listing.
"11. Dormant and/or inactive account listing, if maintained.
"12. Sample copy of past and current depository agreements.
"13. Listing of individual accounts with a "Hold" status and purpose for hold."

12. Interlocutory orders made in the course of an action or proceeding are not binding on the trial court when fashioning the final adjudication of the controversy. *Johnson v. Johnson,* Okl., 674 P.2d 539, 543 (1983); *Ft. Dearborn Trust & Savings Bank v. Skelly Oil Co.,* 146 Okl. 179, 293 P. 557, 562 (1930); *Wells v. Shriver,* 81 Okl. 108, 197 P. 460, 472 (1921); *Kuchler v. Weaver,* 23 Okl. 420, 100 P. 915, 918 (1909).

13. This court had earlier directed the Tax Commission to show cause why we should not disregard the list of materials contained in its "Designation of Supplemental Record" but not included in the appellate record. The apparent deficiency was cured upon the district court clerk's transmission of the supplemental materials to this court. See *Huff v. Huff,* Okl., 687 P.2d 130, 131 (1984).

## II.

### THE DISTRICT COURT'S JURISDICTION TO QUASH THE COMMISSION'S PRE–DISPUTE ADMINISTRATIVE PROCESS FOR INSPECTING THE FINANCIAL RECORDS OF A BANK BELIEVED TO HAVE VIOLATED THE UNCLAIMED PROPERTY ACT

 It is this court's duty to inquire *sua sponte* into not only its own jurisdiction but also into that of the court whence the case came.[14] The district court's adjudicative cognizance over Lincoln's quest to defeat the Oklahoma Tax Commission's administrative process is not expressly provided by either constitutional or statutory law. Persuaded as we are to address this issue, we hold not only that the district court has jurisdiction to hear a challenge to the Commission's inspection process lodged for the purpose of enforcing the Unclaimed Property Act but also that the Commission may, if necessary, invoke the district court's adjudicative cognizance to enforce its administrative process for the same purpose.

The very nature of this controversy determines whether the district court had jurisdiction to consider Lincoln's challenge to the Commission's inspection process. The Commission's August 26 and September 9, 1986 letters to Lincoln mark the issuance of its own pre-dispute inspection process, which Lincoln sought to quash in the district court. The permanent injunction favoring Lincoln was issued *in the absence of a pending adjudicative proceeding before the Commission itself.* Had Lincoln sought judicial relief either during or at the conclusion of such an administrative proceeding, the district court would have been without power to declare rights. The terms of 12 O.S.1981 § 1657[15] prohibit the district court from giving declaratory relief from any order of the Commission.

In case of a final, appealable decision by the Commission, which we do not have here, review would be available in the Supreme Court.[16] Inasmuch as the administrative process issued by the Commission may not be treated as a final order, the terms of 12 O.S.1981 § 951[17] are also ineffective to vest the district court with adjudicative cognizance over the Commission's pre-dispute process. Section 951 gives the district court the power to review only "final order[s] made ... by any tribunal, board or officer exercising judicial functions...."

The district court's power to inquire into the underlying basis for the Commission's pre-dispute process lies in Art. 7 § 7, Okl. Const., which vests in the district court *"unlimited original jurisdiction* of all justiciable matters ... and *such powers of review of administrative action as may be provided by statute."* The district court's "unlimited jurisdiction" to test the process here in contest is consistent with that court's statutory authority to resolve other disputes under the Uniform Disposition of Unclaimed Property Act. For example, the terms of 60 O.S.1981 § 676[18]

---

**14.** *Spain v. Kernell,* Okl., 672 P.2d 1162, 1164–1165 (1983); *Hawkins v. Hurst,* Okl., 467 P.2d 159, 160 (1970) (the court's syllabus ¶ 1); *Clark v. Gray,* 204 Okl. 221, 228 P.2d 654, 656 (1951). See also *Bryan v. Seiffert,* 185 Okl. 496, 94 P.2d 526, 531–532 (1939).

**15.** The pertinent terms of 12 O.S.1981 § 1657 provide:

"[The Uniform Declaratory Judgments Act] ... *shall not be applicable to orders, judgments, or decrees made by* the State Industrial Court, the Corporation Commission, *or any other administrative agency, board or commission* of the State of Oklahoma." (Emphasis added.)

**16.** 68 O.S.1981 § 225. The pertinent terms of § 225 provide:

"(a) Any taxpayer aggrieved by any order, ruling, or finding of the Tax Commission directly affecting such taxpayer may appeal therefrom directly to the Supreme Court of Oklahoma. * * *

" * * * * " (Emphasis added.)

**17.** The terms of 12 O.S.1981 § 951 provide:

"A judgment rendered, or *final order made,* by any tribunal, board or officer exercising judicial functions, and inferior in jurisdiction to the district court, *may be reversed, vacated or modified by the district court* except where an appeal to some other court is provided by law." (Emphasis added.)

**18.** See 60 O.S.1981 § 676, whose pertinent terms provide:

"*Any person aggrieved by a decision of the Oklahoma Tax Commission,* or as to whose claim [it] ... has failed to act within ninety (90) days after filing of the claim, *may commence an action in the district court ... to establish his claim. * * * "* (Emphasis added.)

expressly authorize the district court to review decisions (or failures to act) by the Commission regarding a person's claim to recover property that had been presumed abandoned. The district court's involvement in disputes arising under the Unclaimed Property Act is made manifest also by the provisions of 60 O.S.1981 § 679,[19] which require the Commission, when seeking to compel the holder's delivery of abandoned property, to "bring an action in a court of appropriate jurisdiction [, i.e., the district court]." The terms of 75 O.S.1981 § 315 [20] of the Administrative Procedures Act [21] confer upon the district court adjudicative cognizance to review the issuance of process by many state agencies. Although the Oklahoma Tax Commission is "not required" to comply with this section,[22] the due process standards embodied in the Administrative Procedures Act apply to all state agencies, including the Commission.[23] As a matter of state due process within the meaning of Art. 2 § 7, Okl. Const.,[24] and in conformity to the equal-access-to-courts mandate of Art. 2 § 6, Okl. Const.,[25] we hold that the district court has adjudicative cognizance either to test the legal efficacy

of process issued by the Commission for a pre-dispute, unclaimed property investigation or, if necessary, to enforce that process. The district court's power to compel the release of documents for inspection and its power to order them *withheld* are concomitant.[26]

## III.

## THE EFFECT OF THE FINANCIAL PRIVACY ACT UPON THE COMMISSION'S EXPLICIT STATUTORY DUTY TO ENFORCE THE UNCLAIMED PROPERTY ACT AGAINST BANKS

■ Lincoln argues that in the absence of a subpoena or customer consent the Financial Privacy Act (6 O.S.1981 § 2201 et seq.) prohibits it from disclosing information about customer accounts to any "government authority," [27] including the Oklahoma Tax Commission. The Financial Privacy Act does not, on the other hand, pose any obstacles to access by a "supervisory agency," [28] which status the Commis-

**19.** The pertinent terms of 60 O.S.1981 § 679(a) are:

"(a) If any person refuses to deliver property to the Commission as required under this act, *the Commission shall bring an action in a court of appropriate jurisdiction to enforce such delivery."* (Emphasis added.)

**20.** The pertinent terms of 75 O.S.1981 § 315 are:
" * * *

"(2) In furtherance of the powers granted by subsection (1) hereof, any agency . . . upon its own motion may, and upon the request of any party . . . shall, issue subpoenas for witnesses, or subpoenas duces tecum to compel the production of books, records, papers. . . .

"(3) In case of disobedience to any subpoena . . . the agency may apply to the district . . . court . . . for an order to compel compliance with the subpoena. . . .
" * * * " (Emphasis added.)

**21.** 75 O.S.Supp.1989 § 250.1 et seq.

**22.** See 75 O.S.Supp.1990 § 250.4(B), whose pertinent terms are:

"B. As specified, *the following agencies* or classes of agency activities are *not required to comply with the provisions of Article II of the Administrative Procedures Act* [75 O.S.1981 § 309 et seq.]:

"1. *The Oklahoma Tax Commission;*
" * * * " (Emphasis added.)

**23.** See C. F. Braun & Co. v. Corporation Commission, Okl., 609 P.2d 1268, 1273–1274 (1980).

**24.** The terms of Art. 2 § 7, Okl. Const., provide:

"No person shall be deprived of life, liberty, or property, without due process of law."

**25.** The pertinent terms of Art. 2 § 6, Okl. Const., provide:

"The courts of justice of the State shall be open to every person . . . and right and justice shall be administered without sale, denial, delay, or prejudice."

**26.** See *Tulsa Tribune Co. v. Okl. Horse Racing Com'n,* Okl., 735 P.2d 548, 554–555 (1987).

**27.** See 6 O.S.1981 § 2203, whose terms provide:

"A financial institution is *prohibited* from giving, releasing or disclosing *any financial record to any government authority unless:*
(a) *it has written consent from the customer* for the specific record requested; or
(b) *it has been served with a subpoena* issued pursuant to Section 4 *for the specific record requested."* (Emphasis added.)
"Government authority" is defined by the Financial Privacy Act as "any agency, board, commission or department of the State of Oklahoma, or any officer, employee, representative, or agent thereof." 6 O.S.1981 § 2202(c).

**28.** A "supervisory agency," as distinguished from a "government authority," is defined as *"any state agency, board, commission or department which has statutory authority to examine the financial condition or business operations of"* any particular financial institution. (Emphasis added.) 6 O.S.1981 § 2202(e).

sion claims for purposes of the Unclaimed Property Act.[29] The trial court decided this issue in Lincoln's favor. We hold that for the *singular* mission of fulfilling its statutorily mandated duty to enforce the Unclaimed Property Act, the Commission qualifies as a supervisory agency within the meaning of, and hence unhampered by, the Financial Privacy Act.[30]

Oklahoma adopted the Uniform Disposition of Unclaimed Property Act in 1967,[31] and the Financial Privacy Act was enacted in 1979.[32] Lincoln contends that the later, more "specific" enactment controls and hence operates as a barrier to the Commission's search for unreported abandoned property believed to be held by a bank. We conclude that the legislature intended otherwise.

*Both* acts have been amended since 1979 and financial institutions have not been taken off the list of potential holders of abandoned property who may be investigated by the Commission. Indeed, the 1982 amendment to § 652 [33] of the Unclaimed Property Act, which specifically addresses property held by banks, brought about a decrease in the number of years of dormancy required before the property is presumed abandoned.[34] Moreover, since the Financial Privacy Act's enactment the Commission's enforcement powers under the Unclaimed Property Act had been broadened. For example, by the addition of § 658.8 in 1984 the Commission was empowered "to administer oaths, to conduct hearings, and to compel ... the *production of the books, records and papers of any person, firm, association or corporation.*" (Emphasis added.) Although § 658.8 was repealed, effective September 1, 1991, by Okl.Sess. L., ch. 331 § 64, its provisions were in force when the district court quashed the Commission's inspection process against Lincoln.[35] Moreover, by the terms of newly enacted § 683.2(a) of Title 60, the legislature expressly declared that (1) the 1991 amendments to the Unclaimed Property Act do "not relieve a holder of a duty that arose before the effective date of this act[, September 1, 1991,] to report, pay or deliver property" and (2) "[a] holder who did not comply with the law in effect before the effective date of this act is subject to the applicable enforcement and penalty provisions that then existed and they are contin-

29. See 6 O.S.Supp.1985 § 2205(a), whose pertinent terms provide:

"(a) *Nothing in sections 2201 through 2206 of [the Financial Privacy Act] ... shall prohibit the disclosure or release of any financial record or information to any supervisory agency* in the exercise of its supervisory or regulatory functions with respect to a financial institution." (Emphasis added.)

30. The parties agree that for purposes *other than* those of the Unclaimed Property Act, the State Banking Department is the prime supervisory agency over all state banks and trust companies. See 6 O.S.Supp.1985 § 201 et seq. Inasmuch as Lincoln is an Oklahoma banking corporation and not a federally chartered or national bank, we need not consider, and hence express no opinion regarding, the extent of the Oklahoma Tax Commission's authority under the Unclaimed Property Act to inspect the records of a national bank in search of unreported abandoned property.

31. See Okl.Sess.Laws 1967, ch. 107, § 1 et seq.

32. See Okl.Sess.Laws 1979, ch. 191, § 1 et seq. Oklahoma's Financial Privacy Act came in the wake of *United States v. Miller,* 425 U.S. 435, 439–440, 96 S.Ct. 1619, 1622, 48 L.Ed.2d 71 (1976), where the Court held that depositors have *no protectible Fourth Amendment interest in bank records.* Congress' reaction to the case resulted in the enactment of the Right to Finan-cial Privacy Act of 1978, 12 U.S.C. § 3401 et seq., after which Oklahoma's legislation is patterned.

33. See supra note 10.

34. For example, before the 1982 amendment to § 652 of the Uniform Disposition of Unclaimed Property Act, a savings deposit was presumed abandoned unless the owner indicated an interest in the funds, i.e., made a withdrawal, within a period of *fourteen* years. That period is now *seven* years. See 60 O.S.Supp.1982 § 652, supra note 10.

35. The federal district court declared in 1986 several sections of Oklahoma's unclaimed property statute to be unconstitutional. The parts affected by that decision provided for the custodial taking of undistributed proceeds generated by mineral production in this state. 60 O.S.Supp.1984, §§ 658.2–658.6. The holders of undistributed mineral production runs on hand were required to remit the funds to the State after holding them for a period of one (1) year. In *American Petrofina Co. of Texas v. Nance,* 697 F.Supp. 1183 (W.D.Okla.1986), affirmed, 859 F.2d 840 (10th Cir.1988), the affected sections—§§ 658.2–658.6—were found to be contrary to the scheme of priorities established in *Texas v. New Jersey,* 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965), for the states that take unclaimed property. *American Petrofina* did not affect the constitutionality of § 658.8.

ued in effect for the purpose of this subsection. . . ." (Emphasis added.) Okl.Sess.L. 1991, ch. 331 § 41. Inasmuch as abandoned money lying "dormant" in a bank bears on the latter's financial condition and business operations, the Commission's enforcement powers are consistent with "supervisory agency" status[36] within the meaning of the Financial Privacy Act.[37]

Perhaps the strongest indication of legislative intent either to treat the Commission as a supervisory agency or to keep it free from the Financial Privacy Act's strictures is manifested in 6 O.S.Supp.1985 § 2205(c) of the Financial Privacy Act and in 60 O.S.Supp.1988 § 661(H) of the Unclaimed Property Act. Section 2205(c) *expressly permits banks to notify "a government authority that such institution ... has information that may be relevant to a possible violation of any statute or regulation."* (Emphasis added.) Doubtless the phrase "any statute" includes the Unclaimed Property Act. The Financial Priva-

cy Act hence may not be viewed as a barrier to the Commission's search for unreported abandoned property.

With the exception of information required to be made public, the terms of 60 O.S.Supp.1988 § 661(H) expressly mandate that "[r]eports filed by a holder [of abandoned property] shall remain confidential." This command for confidentiality is indicative of legislative intent to treat the Commission as a supervisory agency only for purposes of enforcing the Unclaimed Property Act.[38] Just as certain records of the State Banking Department must be kept confidential,[39] so too must the Commission keep confidential the inspection-derived information obtained for its limited and carefully circumscribed purpose.

With respect to records containing information on abandoned property alone, there can be no doubt that the Financial Privacy Act poses no barrier to their disclosure.[40] This is so because *no privacy interest exists in property that is presumed aban-*

---

**36.** See supra note 28.

**37.** "Dormant" accounts must be included in every state bank's internal control program, which is required by Rule 14, Rules & Regulations of the State Banking Department. The minimum standards for a bank's compliance with this rule

" * * * [r]equire the Control Officer or Auditor to periodically, no less often than stated herein, perform or supervise performance of:
" * * *

m. *Quarterly*—Prove to the *general ledger* those accounts which have been determined by bank policy to be "dormant/" *Review the operations for compliance to bank policy. Each time activity occurs in a dormant account that activity should be reviewed to establish the authenticity of the entry.*
" * * * " (Emphasis in original.)

**38.** There are no legitimate grounds for Lincoln's concern that financial information obtained by the Tax Commission in a pre-dispute investigation would be subject to the disclosure requirements of the Oklahoma Open Records Act (51 O.S.Supp.1985 § 24A.1 et seq.). Section 24A.5 of this enactment exempts "records specifically required by law to be kept confidential. . . ." The law that initially clothes a bank customer's records with a privacy interest, the Financial Privacy Act, is the same law that prevents the information from being open to the public.

**39.** See 6 O.S.Supp.1986 § 208, whose pertinent terms provide:
"A. The following records in the Banking Department are designated as public records:
"1. All applications for state bank charters and supporting information with the excep-

tion of personal financial records of individual applicants;
"2. All records introduced at public hearings on bank charter applications;
"3. Information disclosing the failure of a state bank and the reasons therefor;
"4. Reports of completed investigations which uncover a shortage of funds in a bank, after the reporting of the shortage to proper authorities by the Commissioner;
"5. Names of all bank stockholders and officers filed in the office of the Secretary of State; and
"6. Regular financial call reports issued at the time of the state bank calls.
"B. *All other records in the Banking Department shall be confidential and not subject to public inspection*; provided, however, that the State Banking Board, State Bank Commissioner, or Deputy Commissioner may divulge such confidential information with the written approval of the Commissioner after receipt of a written request which shall:
"1. Specify the record or records to which access is requested; and
"2. Give the reasons for the request.
* * * " (Emphasis added.)

**40.** The Tax Commission may promulgate rules requiring banks to keep records that specifically embrace deposits and other properties which meet or are approaching the parameters for the presumption of abandonment. See 60 O.S.Supp.1984 § 673, whose terms provide:
"*The Commission is hereby authorized to adopt rules and regulations as may be necessary for carrying out the provisions of the Uniform Disposition of Unclaimed Property Act.*" (Emphasis added.)

*doned by law.* The controversy before us, then, is over how far the Commission may go when examining a bank's records in search of unreported abandoned property. We hold that *only to the extent necessary to fulfill its duties under the Unclaimed Property Act and only for the production of documents critical to a meaningful search* may the Commission issue its pre-dispute process for the inspection of a bank and enforce it in the district court unimpeded by the Financial Privacy Act.[41]

## IV.
## THE VALIDITY OF THE COMMISSION'S PROCESS FOR INSPECTION OF LINCOLN'S FINANCIAL RECORDS

The Commission's authority to examine a person's records for abandoned property is not purely discretionary. The enforcing agency must have "reason to believe" that the person has "failed to report" property presumed abandoned by the Unclaimed Property Act.[42] The trial court found that the Commission "had no reason to believe that the Bank had failed to comply with the Act." Under the standard adopted today for determining the validity of the Commission's process for pre-dispute inspection of documents pursuant to the Unclaimed Property Act, we hold that the statutory reason-to-believe requirement is satisfied.

■ The standard to be applied for testing the underlying basis of the Commission's reason to believe (or reasonable belief) that any person has failed to comply with the Act is no stricter than that which

the U.S. Supreme Court applies in cases where the administrative agency seeks a search warrant to inspect a regulated business for compliance with governing statutes and regulations. In *Marshall v. Barlow's, Inc.*[43] the Court held that, after access is refused, the Occupational Safety and Health Administration must "secure a warrant or other process, with or without prior notice." Although the Commission need not obtain a warrant here, "entitlement to inspect ... [does] not depend on ... [a demonstration of] probable cause to believe that [the law has been violated].... *Probable cause in the criminal law sense is not required.* For purposes of an administrative search ...[, like that attempted by the Commission], *probable cause ... may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied....'"*[44] (Citation omitted and emphasis added.) An inspection by the Commission is hence permissible and meets the statutory reasonable belief requirement when the suspected holder of unreported abandoned property has been chosen "on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources."[45]

Because the trial court sat in equity when it permanently enjoined the Commission, the standard for appellate review is whether its decision is clearly contrary to the weight of the evidence.[46] If it is, this court will render a decision that accords

---

**41.** If judicial process is invoked to enforce the administrative inspection process, the court may, to prevent abuse,

 "inquire into the underlying reasons for the examination. * * * [Abuse would occur] if the [process] ... had been issued for an improper purpose, such as to harass the ... [bank] or to put pressure on ... [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964).

See also generally, 1 Davis, Administrative Law § 4:4 at 233 and § 4:11 at 256–258 (2d ed. 1978). We note that effective September 1, 1991 the Commission is prohibited by statute from using "any information or evidence obtained in the course of an audit for purposes of investigation or enforcement of any state tax law." Okl.Sess. L.1991, ch. 331 § 34.

**42.** See 60 O.S.1981 § 678, whose pertinent terms are:

 "If the Commission has reason to believe that any person has failed to report property

in accordance with this act, it may make demand by certified mail ... that such report be made and filed with the Commission.

 "* * *

 "The Commission may at reasonable times and upon reasonable notice examine the records of any person *if the Commission has reason to believe that such person has failed to report property that should have been reported pursuant to this act.*" (Emphasis added.)

**43.** 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

**44.** *Marshall v. Barlow's, Inc.,* supra note 42, 436 U.S. at 320, 98 S.Ct. at 1824.

**45.** *Marshall v. Barlow's, Inc.,* supra note 42, 436 U.S. at 321, 98 S.Ct. at 1825.

**46.** *Sandpiper North Apartments v. Am. Nat. Bank,* Okl., 680 P.2d 983, 991 (1984); *Amoco Production Co. v. Lindley,* Okl., 609 P.2d 733, 745 (1980); *Regal v. Riegel,* Okl., 463 P.2d 680, 683 (1970).

with the applicable legal norms and with the weight of the proof.[47]

■ The evidence relevant to this inquiry consists of, for example, testimony by a witness for the Commission that "non-compliance" with the requirements of the Unclaimed Property Act is "widespread" among banks in this state. According to undisputed testimony an "audit" program began in 1982 when the legislature appropriated funds sufficient to boost the enforcement effort.[48] Once the inspections started, the number of reporting banks tripled. Lincoln's own reporting history contributed to the need for examination. Of the reports that it had submitted, reference was made only to checking and savings accounts and, on occasion, to "interest checks," while reports from other banks referred to one or more of the following additional sources: cashiers' checks, certificates of deposit, safe deposit boxes, collateral and escrow accounts.

At the time of trial 42% of Oklahoma's banks did not submit any reports, and, of the 260 banks that did, 48 indicated an absence of unclaimed property. Out of the 75 banks that have been examined, *all* had unreported abandoned property. This is perhaps the strongest indication that the Commission's state wide inspection program is not tainted by any discriminatory enforcement criteria or motives.

Lincoln does not argue, and the record is devoid of any indication, that the Commission chose to investigate the Bank based on any *non-neutral* source. Moreover, the evidence considered today is undisputed. We conclude that the Commission had reason to believe Lincoln failed to comply with the Unclaimed Property Act. The burden of showing a neutral, *nondiscriminatory* pattern of enforcement has been met, and Lincoln's district court challenge to the pre-dispute inspection process in suit must hence fail.

THE TRIAL COURT'S PERMANENT INJUNCTION DECREE IS REVERSED; CASE IS REMANDED WITH DIRECTIONS TO DISSOLVE THE INJUNCTION AND TO ENFORCE THE COMMISSION'S ADMINISTRATIVE PROCESS IN ACCORDANCE WITH THIS PRONOUNCEMENT.

47. *Sandpiper North Apartments v. Am. Nat. Bank,* supra note 45 at 991; *Snow v. Winn,* Okl., 607 P.2d 678, 680 (1980); *Marshall v. Amos,* Okl., 471 P.2d 896, 897 (1970) (the court's syllabus).

48. Before the program began in 1982, the average amount of abandoned property from finan-

HODGES, V.C.J., and LAVENDER, HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

DOOLIN and KAUGER, JJ., dissent.

SIMMS, J., dissents.

SIMMS, Justice, dissenting:

I must respectfully dissent. The Financial Privacy Act was enacted to prevent the precise governmental invasion of bank customers' rights of privacy which the majority allows here.

In our recent decision in *Alva State Bank and Trust Co. v. Dayton,* 755 P.2d 635 (Okla.1988), we struck down attempts by a district judge to compel a bank to produce non-party customers' financial records for *in camera* inspection during discovery in private litigation. There we recognized that those records are confidential and that customers have a reasonable expectation of privacy in their bank records which are protected from all governmental authorities by our Financial Privacy Act. Those expectations are of constitutional dimension. *See Nichols v. Council on Judicial Complaints,* 615 P.2d 280 (Okla.1980), and the specially concurring opinion in *Alva State Bank,* supra, regarding Fourth Amendment and Okla. Const., art. 2, § 30 aspects of customers' privacy rights. We noted in *Alva State Bank* as well as *Nichols* that the Act provides the exclusive lawful procedure for obtaining access to customers' financial records and that strict compliance is necessary. That procedure, relied on by Lincoln here, requires either obtaining consent from the customer for the particular record or serving subpoenas which gives customers notice and affords them an opportunity to be heard in protest.

Section 2203 provides:

"A financial institution is prohibited from giving, releasing or disclosing any financial record to *any governmental authority* unless:

(a) it has written consent from the customer for the specific record requested; or

(b) it has been served with a subpoena issued pursuant to Section 4 [Section 2204 of this title] for the specific record requested." (Emphasis added)

cial institutions was $30,000 to $50,000 per year. This annual sum has averaged nearly $1 million since 1983, when the statutorily prescribed number of years for abandonment's presumption dropped from 14 to 7. See supra note 34.

Under our statutory scheme, the Oklahoma Banking Department, through the Board and Commissioner, is charged with supervising and regulating banks to insure compliance with all federal and state laws, including the Unclaimed Property Act, and is empowered with the authority to examine their records for compliance. 6 O.S.Supp.1985, § 201 et seq.

If the Tax Commission is in need of assistance in obtaining information pertaining to unclaimed property held by a financial institution, it should turn to the Banking Department, the legislatively mandated supervisory agency over all state banks and trust companies. The Banking Department contends that testimony before the trial court showed that no purpose is served by allowing the Tax Commission access to records, as the Banking Department *does* examine state banks for compliance with the Unclaimed Property Act and is better prepared to enforce those laws in cooperation with the Commission.

The creation of the Oklahoma Tax Commission as a "supervisory agency" over banks for this or any purpose is an ill-advised gratuity which will permit the Commission to have unbridled perusal of individual customers' accounts. This power of the government to search through the private affairs and papers of its citizens is prohibited by the Financial Privacy Act, and the majority errs in holding otherwise.

I am authorized to state that Justice DOOLIN and Justice KAUGER join with me in the views expressed herein.