717 A.2d 950

## COMPTROLLER OF the TREASURY

v.

## PHH CORPORATION.

No. 1088, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Oct. 6, 1998.

Sheldon H. Laskin, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Deborah B. Bacharach and Renee Nacrelli, Asst. Attys. Gen., on the brief), Baltimore, for Appellee.

L. Paige Marvel (Mitchell Y. Mirviss and Venable, Baetjer and Howard, L.L.P., on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and SALMON and EYLER, JJ.

SALMON, Judge.

This case concerns the circumstances under which the Comptroller of the Treasury ("Comptroller"), may audit the books of a business to find out whether the business holds abandoned property that is required to be turned over to the Comptroller pursuant to the Commercial Law Article ("CL"), Md.Code, §§ 17–301 through 17–326 (1990), Maryland Uniform Disposition of Abandoned Property Act (the "Act"). Section 17–322 of the Act reads:

**Examination of records of persons who have failed to report property; compelling testimony; contempt proceedings.**

(a) *Examination of records.*—At reason-able times and on reasonable notice, the administrator may examine the records of any person if there is reason to believe that the person has failed to report property that should have been reported under this title.

(b) *Compelling testimony.*—If any person refuses to permit the examination of records, the administrator may issue a subpoena to compel the person to testify and produce records. The subpoena shall be served by the sheriff of the county where the person resides or may be found. The person shall be entitled to the same per diem and mileage as witnesses appearing in a circuit court of the State, which shall be paid by the State.

.

(c) *Contempt proceedings.*—If any person refuses to obey any subpoena so issued or refuses to testify or produce records, the administrator may present a petition to the circuit court of the county where the person is served with the subpoena or where the person resides. The court then shall issue an order to require the person to obey the subpoena or to show cause for failure to obey it. Unless the person shows sufficient cause for failing to obey the subpoena, the court immediately shall direct the person to obey and, on refusal to comply, adjudge the person to be in contempt of court and punished as the court may direct.

In Maryland, the Comptroller has been designated as the Administrator under the Act.

Three questions are presented in this appeal:

1. In applying the "reason to believe" test as set forth in CL § 17–322(a), when must the Comptroller have reason to believe that a person has failed to report abandoned property?

2. What does the term "reason to believe" mean?

3. Under the facts of this case, did the Comptroller's knowledge suffice to give him reason to believe that PHH Corporation ("PHH"), had failed to report abandoned funds?

## I. BACKGROUND

### The Maryland Uniform Disposition of Abandoned Property Act

This is the first time that an appellate court in Maryland has been asked to interpret a provision of the Act. A brief review of the Act's history and purpose is therefore useful.

In the early 1950's, individual states "beg[a]n clamoring for uniform legislation addressing the escheat of intangible property. In response, the National Conference of Commissioners on Uniform State Laws began drafting comprehensive legislation." K. Reed Mayo, *Virginia's Acquisition of Unclaimed and Abandoned Personal Property,* 27 Wm. & Mary L.Rev.

409, 417–18 (1986). The product that emerged, in 1954, was the Uniform Disposition of Unclaimed Property Act (the Uniform Act). The Uniform Act was revised in 1966 and again in 1981 to, among other things, "strengthen[ ] enforcement provisions to assist the states' efforts to monitor compliance by holders." *Id.* at 418. To date a majority of states has adopted some version of the Uniform Act.

■ The Uniform Act is remedial legislation "designed to put an end to the unearned and fortuitous enrichment of the holders of abandoned property and to provide instead for the interests of the citizens ... and ensure that any such escheat would be for public benefit rather than for private gain." *Riggs Nat'l Bank of Washington, D.C. v. District of Columbia,* 581 A.2d 1229, 1233–34 (D.C.App.1990).

In 1966, Maryland enacted its version of the Uniform Act. The Maryland Act was based substantially on the 1954 Uniform Act; Maryland has only partly adopted the changes that were made in the 1966 and 1981 revisions to the Uniform Act.

In Maryland, "abandoned property" is defined as tangible and intangible personal property "includ[ing] property in the custody of the federal government that is classified as 'unclaimed property' under federal law." CL § 17–101(b),(c). In most instances, property is considered "abandoned" if it remains unclaimed for more than five years after becoming payable. CL §§ 17–301 to 17–308. Moreover, property is considered abandoned regardless of whether the owner later makes a demand for payment. CL § 17–308(a)—(c).

Under the Act, businesses in Maryland have an annual obligation to (among other things) file with the Comptroller a report listing the abandoned property that they have in their possession. CL § 17–310. The property holder must then deliver the abandoned property to the Comptroller, CL § 17–312, who acts as guardian for the true owner. CL § 17–313. Because there is no statute of limitations as against the true owner of the property, the property owner may at any time petition the Comptroller for return of his or her property. CL § 17–318.

## II. THE TWO COMPLAINTS

On May 24, 1996, the Comptroller filed a complaint against PHH requesting declaratory and injunctive relief. The Complaint alleged, in part:

7. If the Administrator [Comptroller] has reason to believe that a person has failed to report property that should have been reported, he may examine the records of the person at reasonable times and on reasonable notice. Md. Comm. Law Code Ann. § 17–322(a).

8. The Administrator reviews approximately 12,000 reports of abandoned property each year. In addition, the Administrator examines the records of approximately 190 to 215 holders per year, most of whom have failed to file reports.

9. The Administrator has limited resources available with which to conduct the examinations of records of holders of abandoned property. Consequently, the Administrator has a contract with several private vendors, including the National Abandoned Property Processing Corporation ("NAPPCO") to conduct the reviews of selected unclaimed property records. The determination to utilize the services of NAPPCO is made based on the volume of the records, the scope of the corporation's business (i.e., whether the business is conducted interstate), any information regarding the corporation that NAPPCO may already have obtained, the number of corporate employees, shareholders and subsidiaries, and the corporation's prior reporting history.

10. NAPPCO is paid a fee for its services equal to a percentage of the amount of abandoned property actually remitted to the Comptroller as a result of its review. NAPPCO is not paid anything for identifying property as abandoned, unless that property is in fact remitted to the Comptroller.

11. NAPPCO routinely executes confidentiality agreements with audit subjects when it conducts a review.

12. The defendant PHH Corporation ("PHH") has in recent years filed unclaimed property reports which list

uncashed dividends and other securities as abandoned. However, PHH has never reported any uncashed vendor or employee checks.

13. Based upon the nature of PHH's business, the Administrator has reason to believe that PHH has uncashed vendor or employee checks or other abandoned property in its possession which it has failed to report.

The Complaint went on to allege that the Administrator of the Abandoned Property Division, on September 8, 1995, notified PHH that a review of its records would be conducted by NAPPCO "because of the interstate nature and large volume of PHH's leasing business." PHH objected to the audit, by letter dated November 30, 1995, contending that it would not submit to an audit by NAPPCO. The Complaint asked the Court to declare that the Comptroller had the right to delegate the authority to conduct an audit to private entities such as NAPPCO and to issue an injunction requiring PHH to undergo an audit by NAPPCO.

PHH filed a motion to dismiss the Complaint, contending in pertinent part, that

[Section 17–322(a)] authorizes the Comptroller's Office to examine the records of any person, [but] such an examination may only be conducted "if there is reason to believe that the person has failed to report property that should have been reported" under [the Act]. Where a corporation has filed the required abandoned property reports and has identified abandoned property in accordance with the requirements of [the Act] as PHH has done here, the "reason to believe" standard of Section 17–322 should require more than simply a generalized suspicion of an omission based solely on the nature of the corporation's business. *See,* Complaint, ¶ 13.

Since the Comptroller has failed to plead sufficient facts to support its claim that it has "reason to believe" that PHH has failed to report abandoned property as required by Section 17–322, the Comptroller has not established that any audit under [the Act] is appropriate. If the threshold

requirement for an abandoned property audit established by Section 17–322 is not satisfied, neither the Comptroller nor NAPPCO has any right to conduct an audit of PHH. In order for declaratory relief to be granted, Section 3–409(a) of the Courts and Judicial Proceedings Article requires that there be a justiciable controversy between the parties. If the Comptroller's Office cannot establish that an audit is appropriate, then there is no audit and there is no controversy between the parties which is appropriate for resolution by declaratory judgment.

PHH's motion to dismiss was heard in the Circuit Court for Baltimore County on December 23, 1996. In regard to the question of whether the Comptroller sufficiently alleged facts demonstrating that the Comptroller had "reason to believe" that PHH held abandoned property, the Court ruled that the reasons could be better articulated. Accordingly, the Court granted the motion to dismiss but gave the Comptroller leave to file an amended complaint.

An amended complaint was timely filed by the Comptroller on January 21, 1997. It was in many respects identical to the initial complaint, but the following facts were added:

12. The [d]efendant, [PHH], is one of the largest corporations in the State of Maryland. It engages in numerous business activities[.]

13. From 1990 to 1994, PHH's annual sales in each year equaled or exceeded [$2 billion]. It's [sic] net income for those years ranged from $47,079,000 in 1991 to $64,558,000 in 1994. PHH has over 5,000 employees and thirteen subsidiaries.

14. In recent years, PHH has filed un-claimed property reports that list uncashed dividends and other securities as abandoned. However, PHH has never reported any uncashed vendor or employee checks for unclaimed wages or expense reimbursements.

15. Subsequent to December 23, 1996 [the date of the hearing on the original motion to dismiss], Lynn Hall, the Manager of the Unclaimed Property Section[,] reviewed

reports filed with the office by eight holders of property presumed abandoned from 1992 to the present, pursuant to Md. Commercial Law Code, § 17–310 (1990 Rep. Vol., 1996 Supp.). None of these holders is as large as PHH nor do they provide the comprehensive services that PHH does. However, each holder provides some of the same services that PHH does. As a result of this review, Ms. Hall identified $239,888.67 remitted to the Comptroller as property presumed abandoned during that period by these eight holders. The abandoned property reported by these holders ... consists almost entirely of unclaimed accounts payable, wages or payroll, vendor checks and the proceeds of escrow accounts. By contrast, PHH has never reported or remitted such funds to the Unclaimed Property Section.

16. In the normal course of operation of a business of the nature of PHH, checks are periodically issued to employees, either for wages or for expense reimbursements, that are never negotiated. Similarly, a business such as PHH would ordinarily report payment to vendors that were never negotiated. Mortgage banking services would ordinarily report unclaimed proceeds of escrow accounts. Unlike the other holders reviewed, PHH has never reported any such payments. Based on the nature and scope of PHH's business and a comparison to other, considerably smaller, holders, it is reasonable to believe that PHH would have i[n] its possession abandoned property in the form of uncashed vendor or employee checks and the proceeds of unclaimed escrow accounts.

PHH moved to dismiss the amended complaint on the grounds that it failed to state a claim upon which relief could be granted. Specifically, PHH contended that the facts set forth in the amended complaint "establish that [the Comptroller] did not have 'reason to believe that [PHH] has failed to report property that should have been reported'" as required by § 17–322(a) of the Act. PHH also contended that the Comptroller was required to allege facts in its complaint, but did not, that would show that PHH was selected for audit on the basis of a general administrative plan, derived from neutral

sources, for the enforcement of the Act and that the Comptroller had conducted an analysis sufficient to satisfy this statutory prerequisite.

The motions judge (Kahl, J.) dismissed the amended complaint for two interrelated reasons. First, he concluded that "the amended complaint did not contain any allegations to demonstrate that [d]efendant PHH was *selected* for audit based on a determination that it had reason to believe that it had failed to report abandoned property." (Emphasis added.) Secondly, based on the facts alleged as to what Lynn Hall, the Manager of the Unclaimed Property section, said she did after December 23, 1996, the court deduced that *prior* to December 23, 1996, "the Comptroller's office had no 'reason to believe' whatsoever that [d]efendant PHH failed to report property subject to the Act." The trial court penultimately concluded:

> Thus, without resolving the issue regarding the underlying standard to be applied under the "reason to believe" language found within Section 17–322 of the Commercial Law Article, this Court finds that the Comptroller selected [d]efendant PHH for an audit under the Maryland Uniform Disposition of Abandoned Property Act without having made any prior determination as required by law.

### III. ANALYSIS

 Before addressing the substance of appellant's legal arguments, we note at the outset, as many previous appellate courts have done, that it is, with a few well defined exceptions, inappropriate to dismiss a declaratory judgment action. As the Court of Appeals said in *Christ v. Department of Natural Resources*, 335 Md. 427, 435–36, 644 A.2d 34 (1994):

> It is proper to dismiss a declaratory judgment action only where there is a lack of jurisdiction or where a declaratory judgment is not an available or appropriate type of remedy. *See, e.g., Popham v. State Farm, supra*, 333 Md. at 140–141 n. 2, 634 A.2d 28 (declaratory judgment ordinarily is not available when the issue has become moot); *Turnpike Farm v. Curran, supra*, 316 Md. at 49, 557 A.2d 225 (declaratory

judgment action is not available, and should be dismissed, where there is a pending action between the parties presenting the same issue); *Boyds Civic Ass'n v. Montgomery County, supra,* 309 Md. at 688–700, 526 A.2d 598 (declaratory judgment action, to be entertained by the court, must present a justiciable controversy); *State v. Burning Tree Club, supra,* 301 Md. at 18, 481 A.2d 785 (declaratory judgment action should be dismissed where the plaintiff lacks standing); *Koontz v. Ass'n of Classified Emp., supra,* 297 Md. at 529–530, 467 A.2d 753 (declaratory judgment action was properly dismissed where the dispute had become moot).

Where a controversy is appropriate for resolution by declaratory judgment, however, the trial court must render a declaratory judgment. The court's rejection of the plaintiff's position on the merits furnishes no ground for dismissal. In *East v. Gilchrist, supra,* 293 Md. at 461 n. 3, 445 A.2d 343, this Court, in language directly applicable to the present case, pointed out that

> "where a plaintiff seeks a declaratory judgment that a particular legal provision is valid (or invalid), and the court's conclusion regarding the validity of the provision is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment setting forth the court's conclusion as to validity."

In the case at hand, the trial court had jurisdiction and declaratory relief was an appropriate remedy. The trial court should have declared the rights of the parties instead of dismissing the complaint.

## A. Issue 1

*When* must the Comptroller have reason to believe that a person has failed to report abandoned property?

Both PHH and the trial judge assumed that in order for the Comptroller to be entitled to injunctive or declaratory relief, the Comptroller was required to *allege* facts demonstrating

that at the moment PHH was selected for an audit the Comptroller, or his designee, had reason to believe that PHH had failed to report abandoned property. The motions judge and PHH also appear to assume that if the reason to believe came after the moment of selection the "reason" came too late and PHH was forever immune from audit. Neither of these assumptions are warranted by the words of the statute, logic, or any pertinent authority. It is also most assuredly not warranted in a declaratory judgment action in which the Comptroller asks the court to declare its *current* right to review records.

Under the plain wording of CL § 17–322(a), the right to audit comes into being at a discrete and easily identifiable point in time—whenever the Comptroller has "reason to believe" that the subject of the proposed audit has failed to report abandoned property. The amended complaint asked the court to declare that *as of that* date the Comptroller had a right to an audit and that PHH was required to submit to one. Thus, even if we were to assume that PHH was legally justified, prior to suit, in refusing the audit because the Comptroller had no "reason to believe" that it had failed to report abandoned property as required under the Act, PHH's resistance to the audit would no longer be justified if there presently existed a "reason to believe."

■ Accordingly, we hold that it would be improper to deny the Comptroller declaratory relief on the basis that the Comptroller failed to allege facts that demonstrated that at the time PHH was selected for audit the Comptroller had reason to believe that PHH had failed to report abandoned property.

## B. Issue 2

What does the term "reason to believe" mean?

PHH contends that in order for the Comptroller to have "reason to believe" that there has been a failure to report abandoned property the Comptroller must have "specific evidence" that "an existing statutory violation" has occurred or the Comptroller must make his selection for audit based upon

"a generalized selection process ... [using] neutral, objective and non-arbitrary standards administered in a systematic fashion." According to PHH, both the case of *Lincoln Bank and Trust Co. v. Oklahoma Tax Commissioner*, 827 P.2d 1314 (Okla.1992), and *First National Bank of Saint Paul v. Lord*, No. 447350, District Court for the Second Judicial District of Minnesota (Ramsey County) (mem. op. April 20, 1982), support its position. *Lincoln Bank* does not stand for this proposition and neither does the *Lord* case.

Before detailing the facts in the *Lincoln Bank* case, it is necessary to segue, briefly, to a discussion of *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), and some relevant Maryland precedent. *Marshall*, a case relied upon by the *Lincoln Bank* Court, involved the issue of whether the Secretary of Labor needed a search warrant to search commercial premises in order to ascertain whether safety hazards existed that would endanger workers. *Id.* The *Marshall* Court ruled that a search warrant was usually required. There were, however, a few narrow exceptions to the warrant requirement, *e.g.*, closely regulated industries such as those engaged in the sale of alcohol or firearms. *Id.* at 314–15, 98 S.Ct. 1816. Search warrants, of course, may be signed by a judge only if there exists probable cause to believe that the law is being, or has been, violated. The *Marshall* Court held that probable cause, for purposes of the issuance of an administrative search warrant, will exist if a business has been chosen for a search based on specific evidence of an existing violation or based upon a "general administrative plan for enforcement of the [OSHA] Act derived from neutral sources." *Id.* at 320, 98 S.Ct. 1816.

The Court in *Marshall* made a point of distinguishing search warrant cases from other cases where the statute "envision[s] ... [court] enforcement [of laws] when entry [for the search] is refused." *Id.* at 321, 98 S.Ct. 1816. Impliedly, at least, the *Marshall* Court was of the view that in cases where an administrative agency issues *subpoenas* for records the government need not show "probable cause" as it must when a search warrant is requested so long as the statute

provides for court review if the subpoena is dishonored. *Id.;
see also Vulcan Waterproofers, Inc. v. Maryland Home Im-
provement Comm'n,* 253 Md. 204, 210, 252 A.2d 62 (1969)
(probable cause not needed prior to the issuance of an admin-
istrative subpoena); *Parlato v. State Comm'n on Human
Relations,* 76 Md.App. 695, 548 A.2d 144 (1988), *cert. denied,*
314 Md. 497, 551 A.2d 867 (1989) (same); *State Comm'n on
Human Relations v. Baltimore County,* 46 Md.App. 45, 415
A.2d 856 (1980) (same). A subpoena, of course, constitutes far
less of an invasion of privacy than does a search warrant.

The Court of Appeals said in *Banach v. State Comm'n on
Human Relations,* 277 Md. 502, 507, 356 A.2d 242 (1976):

That the Legislature may validly confer upon administra-
tive agencies such as the Human Relations Commission the
power to compel production of information for purposes of
preliminary investigation is well settled. *United States v.
Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 94
L.Ed. 401 (1950); *Vulcan, [Waterproofers], Inc. v. Md.
Home Imp. Comm'n,* 253 Md. 204, 210, 252 A.2d 62 (1969).
We look first, then, to the applicable statute to determine
whether it authorizes issuance of the subpoena duces tecum
in question here. Section 14(d) of Art. 49B, entitled "Power
of Commission to administrator oaths, etc.; subpoenas,"
provides in relevant part:

"In the *administration and enforcement* of the provi-
sions of *these several subtitles,* the Commission has power
to administer oaths and to issue subpoenas, to compel the
attendance and testimony of witnesses and the production
of books, papers, records and documents relevant or
necessary for *proceedings* under the *particular subtitle.*
. . ." (emphasis added).

The statute then provides that enforcement of a subpoena,
in the event of refusal to comply, may be sought in the
circuit court, which, upon a finding that the matters or
documents sought are "relevant or necessary for the *pro-*

*ceedings* of the Commission," may compel obedience under the penalty of contempt. (emphasis added).

(Footnote omitted.)

Under the Act, the Comptroller has no right simply to search the records of a commercial enterprise that is suspected of failing to report abandoned property. If the operator of a business, after notice by the Comptroller, refuses to permit a search of the records, a subpoena to compel the production of records is issued, and if the subpoena is disobeyed, the disobedient party has a right to a hearing in circuit court to show cause why he/she failed to obey the subpoena. CL § 17–322. These provisions of the Act bring it within the class of statute, recognized and distinguished in *Marshall*, where the statute envisions court enforcement when entry into the commercial establishment is refused.

In the *Lincoln Bank* case, the Oklahoma Supreme Court interpreted a statute nearly identical to the one here at issue. 827 P.2d at 1315. Under the Oklahoma statute, the Oklahoma Tax Commission (the Commission) is charged with enforcement of the Act. *Id.* The Commission, on August 26, 1986, wrote a letter to the Lincoln Bank and Trust Company expressing its intent to inspect the bank's records because the Commission believed that the bank had failed to comply with the Act. The belief was based on the fact that:

(a) "[n]o reports [were] on file for 1978 and 1979, with negative reports filed for 1980 and 1981"; (b) "[i]tems reported consistently by other comparably sized banks have not been reported by Lincoln Bank & Trust" and (c) "[its] reporting history is not compatible with other similarly sized banks."

*Id.* (footnote omitted).

Lincoln Bank refused to produce any of the documents requested by the Commission, and as a consequence, *Lincoln Bank* brought suit to quash, by injunctive relief, the Commission's administrative process for inspection of financial records. *Id.* at 1316. The trial court granted the injunction, *id.*

at 1317, after which the commission appealed. One of the issues presented on appeal was:

Did the Commission have a legally sufficient reason to believe that the bank had failed to comply with the reporting requirements of the Act?

*Id.* at 1314. The *Lincoln Bank* Court answered "yes" to that question and in doing so stated:

The standard to be applied for testing the underlying basis of the Commission's reason to believe (or reasonable belief) that any person has failed to comply with the Act *is no stricter than that which the U.S. Supreme Court applies in cases where the administrative agency seeks a search warrant to inspect a regulated business for compliance with governing statutes and regulations.* In *Marshall v. Barlow's, Inc.*[, 436 U.S. 307, 321, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978),] the court held that, after access is refused, the Occupational Safety and Health Administration must "secure a warrant or other process, with or without prior notice." Although the Commission need not obtain a warrant here, "entitlement to inspect ... [does] not depend on ... [a demonstration of] probable cause to believe that [the law has been violated].... Probable cause in the criminal law sense is not required. For purposes of an administrative search ... [, like that attempted by the Commission], probable cause ... may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied....'" (Citation omitted and emphasis added.) An inspection by the Commission is hence permissible and meets the statutory reasonable belief requirement when the suspected holder of unreported abandoned property has been chosen "on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources."

*Id.* at 1322 (footnotes omitted; emphasis added).

What general administrative plan the Oklahoma Commission had is not made clear by the *Lincoln Bank* decision. But

at least one of the reasons the Commission had to believe that Lincoln Bank had failed to report abandoned property was similar to the reason set forth against PHH in the amended complaint, i.e., items reported consistently by other comparably sized banks had not been reported by the bank. The *Lincoln Bank* Court said:

> The evidence relevant to this inquiry consists of, for example, testimony by a witness for the Commission that "noncompliance" with the requirements of the Unclaimed Property act is "widespread" among banks in this state. According to undisputed testimony an "audit" program began in 1982 when the legislature appropriated funds sufficient to boost the enforcement effort. Once the inspections started, the number of reporting banks tripled. Lincoln's own reporting history contributed to the need for examination. Of the reports that it had submitted, reference was made only to checking and savings accounts and, on occasion, to "interest checks," while reports from other banks referred to one or more of the following additional sources: cashiers' checks, certificates of deposit, safe deposit boxes, collateral and escrow accounts.
>
> At the time of trial 42% of Oklahoma's banks did not submit any reports, and, of the 260 banks that did, 48 indicated an absence of unclaimed property. Out of the 75 banks that have been examined, all had unreported abandoned property. This is perhaps the strongest indication that the Commission's state wide inspection program is not tainted by any discriminatory enforcement criteria or motives.

*Id.* at 1323 (footnote omitted).

In sum, the Court in *Lincoln Bank* said that (1) the "reason to believe standard" is "no stricter" than the probable cause standard set forth in the *Marshall* case, and (2) the *Marshall* standard required a showing that the agency have either specific knowledge of wrongdoing or proof that the suspected holder of unreported abandoned property was chosen "on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources."

We agree with the *Lincoln Bank* Court that the "reason to believe" standard is "no stricter" than the "probable cause" standard set forth in *Marshall,* but this avoids the issue of whether the test is as strict as the probable cause standard. The *Lincoln Bank* case does not answer that question and therefore does not stand for the proposition that the "reason to believe" standard is the same as the standard set forth in *Marshall.* Moreover, as already demonstrated, the *Marshall* case itself and Maryland precedent dealing with the issue of when administrative subpoenas may be issued leads us to conclude that the *Marshall* standard need not be met in order for the Comptroller to have "reason to believe" under the Act.

The *Lord* case concerned Minnesota's version of the Uniform Abandoned Property Act. The judge in the *Lord* case opined that

[t]o support a finding of "reason to believe", there must be specific articulable facts, within the totality of the circumstances, which are known to the state treasurer that would justify a reasonable person familiar with the field of unclaimed property in believing that a holder was not reporting property as required by the Act. . . .

*Lord,* slip op. at 2.

Witnesses for the State Treasurer in the *Lord* case testified that appellant was selected for audit based on a "nonexclusive" list of "criteria" or "standards." *Id.* The Court in *Lord* commented:

Both parties have submitted numerous definitions of what, as a legal matter, "reason to believe" means. The list of alleged criteria set forth certain factual situations, which, if found *may* lead an examiner to determine that there exists "reason to believe." Secondly, the list is nonexclusive and there is no indication in the record that these criteria or standards have been "adopted" by the agency either formally or informally. The list, as indicated in the interrogatory, includes any or all criteria used by the agency since 1977. In fact, the testimony would indicate they are merely *some* of the factors given by Mr. Andreoli to the department to

help examiners determine "reason to believe". Presumably some examiners would rely on them exclusively, while others might choose to ignore them completely. The entire area is extremely subjective.

*Id.* at 4.

The *Lord* Court concluded that facts were presented by the State Treasurer from which a reasonable person familiar "with the field of unclaimed property" could justifiably conclude that the bank had failed to report unclaimed property. *Id.* at 3.

█ Nothing in the Maryland Act suggests that in order for the Comptroller to have "a reason to believe" that a corporation or other entity has failed to report abandoned property, he must arrive necessarily at that belief based either on information that the subject of the audit has engaged in specific acts of wrongdoing or on a general plan for the enforcement of the Act derived from "neutral sources." It seems obvious that without such a "general plan" and without specific information as to wrongdoing, a person knowledgeable in the field of abandoned property could still have "reason to believe" that there had been a failure to report by other means. We adopt the view of the *Lord* Court and hold that to meet the "reason to believe" standard, the Comptroller must be able to point to specific articulable facts that would justify a belief by a reasonable person, knowledgeable in the field of unclaimed property, that a person or business entity was not reporting abandoned property as required by the Act.

## C. Issue 3

Under the facts of this case, did the Comptroller's knowledge suffice to give him reason to believe that PHH had failed to report abandoned funds?

The amended complaint alleged, in pertinent part, that (1) the Comptroller reviews nearly 12,000 reports of abandoned property each year; (2) PHH is a large corporation with a net earning of between $50—60 million per year and with over 5,000 employees; (3) PHH has filed unclaimed property reports that list abandoned dividend checks and securities but

has *never* listed *any* uncashed vendor or employee checks; (4) a review of the files of eight other businesses, all of which are smaller than PHH but which provide some of the same services as PHH, showed that a total of $239,000 of the abandoned property was reported by these companies, and the abandoned property from these companies consisted almost entirely of employee and vendor checks; and (5) based on the nature and scope of PHH's business "and a comparison to other, considerably smaller holders," it would be reasonable to believe that PHH had in its possession the same type of abandoned property. Attached to the amended complaint was an affidavit from Lynn E. Hall, the manager of the Comptroller's Unclaimed Property Section. In the affidavit, Ms. Hall reiterates most of what is specifically alleged about PHH in the amended complaint. In addition, she says in Paragraph 6 of the affidavit:

> Based upon my experience as Manager, PHH's failure to report uncashed vendor and employee checks is highly unusual. As a result, I have reason to believe that PHH in fact holds such checks. In the absence of an audit, there is no way to be certain that PHH holds uncashed vendor or employee checks.

Assuming the truth of the facts set forth in the amended complaint and the affidavit attached thereto, the "reason to believe" standard has been met. If smaller companies in the same line of business regularly report unclaimed payroll vendor checks, unclaimed accounts payable, and unclaimed escrow accounts, and PHH never does, it can be inferred logically that there is a very strong likelihood that PHH has failed to report as required by the Act.

## CONCLUSION

This declaratory action should not have been dismissed. Nevertheless, before the rights of the parties are declared, the parties are entitled to a hearing. At the hearing, it may develop that the facts set forth in the amended complaint are untrue. Therefore, upon remand, the court should conduct an

234

evidentiary hearing and, based upon the facts developed at that hearing, declare the rights of the parties.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS; COST TO BE PAID BY APPELLEE.**